[No. A123948. First Dist., Div. Four. Mar. 12, 2010.]

LESLEY EMMINGTON JONES et al., Plaintiffs and Appellants, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B.2 and II.C.

Counsel

Michael Lozeau for Plaintiffs and Appellants.

Cox, Castle & Nicholson, Michael H. Zischke; and Nancy M. Ware for Defendant and Appellant.

Opinion

**SEPULVEDA, J.**—A group of concerned citizens (plaintiffs) filed a petition for writ of mandate under the California Environmental Quality Act (CEQA or Act; Pub. Resources Code, § 21000 et seq.), challenging the certification of an environmental impact report (EIR) by the Board of Regents of the University of California (the Regents) regarding projected development of the Lawrence Berkeley National Laboratory (the Lab or LBNL). The trial court ruled partly in favor of plaintiffs and partly in favor of the Regents. Each party has appealed. Based on our de novo review, we reverse in favor of the Regents.

## I. BACKGROUND

The Lab is a special research campus operated by the University of California (UC), "but it is owned and financed by the federal government and as such is distinct from the UC-owned Berkeley campus." The Lab occupies a 202-acre site (main site or hill site) on land owned by the Regents, which is located in the eastern hills of Berkeley and Oakland. The Lab also occupies and uses space on the UC Berkeley campus (campus site), and in various leased locations mostly in Berkeley, Oakland, and Walnut Creek (off-site spaces).

In January 2007, the Regents published a draft EIR for its 2006 long-range development plan (LRDP or 2006 LRDP),[1] which serves as the comprehensive land use plan to guide physical development of the Lab's main site. The proposed 2006 LRDP[2] "does not constitute a commitment to any specific project . . . ." Rather, the 2006 LRDP EIR is a program-level EIR that evaluates the effects of implementation of the entire LRDP, which describes the development program for the main site through 2025.

---

[1] Public Resources Code section 21080.09, subdivision (a)(2) defines a long-range development plan as "a physical development and land use plan to meet the academic and institutional objectives for a particular campus . . . ." Subdivision (b) specifies that "the approval of a long range development plan . . . require[s] the preparation of an environmental impact report."

[2] The Lab's existing LRDP and EIR were approved in 1987.

A program EIR is defined by the Guidelines[3] as "an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168, subd. (a).)

The LRDP establishes four land use zones at the main site. The zones are (1) research and academic (121 acres), (2) central commons (6 acres), (3) support services (19 acres), and (4) perimeter open space (56 acres). The LRDP also "calls for developing clusters of research and academic uses close to one another and creating usable, attractive plazas and other open spaces that would function as 'commons' for nearby buildings. This clustering of development would allow the Lab to evolve into a more campus-like setting, fostering interaction and informal encounters among Lab staff . . . ." "These clusters will be known as individual 'hill towns' with their own unique character and themes."

Under the proposed LRDP, "the total building area at the main . . . site could increase from 1.76 million gross square feet (gsf) of occupiable space to as much as 2.42 million gsf of occupiable space, for an overall increase over the life of the LRDP of 660,000 net new gsf." The Lab's total adjusted daily population (ADP) at all locations is projected to increase by 1,000 for an ADP of 5,375.[4] Additionally, "parking on the hill site would increase by approximately 500 net new spaces for a total of 2,800 parking spaces."

The LRDP EIR considers five alternatives to the proposed LRDP. The alternatives are (1) "No Project Alternative" (as required by CEQA); (2) "Reduced Growth 1 Alternative"; (3) "Reduced Growth 2 Alternative"; (4) "Preservation Alternative with Non-LBNL Use of Historical Resources"; and (5) "Off-Site Alternative." The "No Project Alternative" "would result in development at the main . . . site pursuant to the existing 1987 LRDP, and the proposed 2006 LRDP would not be implemented." Under this alternative, "the amount of occupiable building space would increase up to approximately 2 million gsf, or roughly 13 percent above

---

[3] All references to "Guidelines" are to the CEQA Guidelines, which implement the provisions of the Act. (Cal. Code Regs., tit. 14, § 15000 et seq.)

[4] The ADP calculation represents "the Lab's full-time-equivalent employment plus 40 percent of annual guests . . . ."

existing conditions, and the ADP would increase by about nine percent, to 4,750. No increases in the parking supply would occur." The "Reduced Growth 1 Alternative" "would represent about 63 percent of the net new occupiable building space, about 76 percent of the new ADP, and 75 percent of the net new parking spaces proposed under the 2006 LRDP." The Reduced Growth 2 Alternative "represents 102.5 percent of the new ADP, about 89 percent of the net new occupiable building space, and 75 percent of the net new parking spaces." Under the "Non-LBNL Use of Historical Resources," "a limited number of key historical resources, when determined to be no longer of feasible use to the . . . Lab, would be dedicated to non-LBNL uses and could be managed by another public agency, such as the National Park Service." This alternative "would avoid the proposed 2006 LRDP's significant, unavoidable effects on cultural resources but would result in the same impacts of the proposed project in other respects, as the development program would otherwise be the same." The "Off-Site Alternative" "proposes that all development under the 2006 LRDP, including increases in ADP, occupiable building space and parking spaces," would be divided between the hill site and at an offsite location, specifically the Richmond Field Station. At the Richmond Field Station, "an ADP of 390 would be accommodated, and 383,800 square feet of new occupiable building space and 225 new parking spaces would be constructed." Development at the hill site "would accommodate the remaining projected growth under the 2006 LRDP, and would be the same as the Reduced Growth 1 Alternative."

The draft EIR for the 2006 LRDP was published on January 22, 2007. Comments on the draft EIR were accepted through March 23, 2007. A public hearing on the draft EIR was held on February 26, 2007. On July 19, 2007, the Regents certified the EIR, adopted the accompanying mitigations and findings, and issued a statement of overriding considerations. On July 20, 2007, a "Notice of Determination" was filed with the Governor's Office of Planning and Research.

Plaintiffs petitioned the trial court for a writ of mandate challenging the approval of the 2006 LRDP and the certification of the associated EIR. On October 27, 2008, the trial court issued a statement of decision granting the petition in part and denying it in part. In so ruling, the trial court entered judgment against the Regents and in favor of the plaintiffs on the limited ground that the Regents had failed to recirculate a portion of the final EIR that was added in response to comments to the draft EIR. Plaintiffs and the Regents timely appealed.

## II. DISCUSSION

### A. *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995) 9 Cal.4th 559,] 568 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278] . . . .) [¶] An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fns. omitted.) We therefore resolve the CEQA issues by independently determining whether the administrative record demonstrates any legal error by the Regents and whether it contains substantial evidence to support the Regents' factual determinations.

### B. *Plaintiffs' Appeal*

The plaintiffs' appeal concerns two issues: the project alternatives and water quality impacts.

#### 1. *Alternatives*

Plaintiffs argue that the Regents abused their discretion in two ways with regard to consideration of alternative plans: first, that a so-called "true off-site" alternative was not considered; and, second, that alternatives were improperly rejected based on "undefined" project objectives. Neither contention withstands analysis.

##### a. *Range of Alternatives*

"The purpose of an EIR is to give the public and government agencies the information needed to make informed decisions, thus protecting ' "not only the environment but also informed self-government." ' ([*Citizens of*] *Goleta* [*Valley v. Board of Supervisors* (1990)] 52 Cal.3d [553,] 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) The EIR is the heart of CEQA, and the

mitigation and alternatives discussion forms the core of the EIR. (*Ibid.*)" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 [77 Cal.Rptr.3d 578, 184 P.3d 709] (*Bay-Delta*).)

■ The basic framework for analyzing the sufficiency of an EIR's description of alternatives is set forth by the Guidelines and by the California Supreme Court in *Citizens of Goleta Valley v. Board of Supervisors, supra*, 52 Cal.3d 553 (*Goleta*) and *Bay-Delta, supra*, 43 Cal.4th 1143. (*Id.* at pp. 1162–1163.) Specifically, "CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. (Pub. Resources Code, § 21061; see also *id.*, §§ 21001, subd. (g), 21002, 21002.1, subd. (a), 21003, subd. (c); *Goleta, supra*, 52 Cal.3d at pp. 564–565.) The CEQA Guidelines state that an EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' ([Guidelines], § 15126.6, subd. (a).) . . . [¶] 'In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of "feasibility." ' (*Goleta, supra*, 52 Cal.3d at p. 565.) CEQA defines 'feasible' as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' (Pub. Resources Code, § 21061.1; see also [Guidelines], § 15364.) [¶] ■ 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' ([Guidelines], § 15126.6, subd. (a).) The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' (*Id.*, § 15126.6, subd. (f).) An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' (*Id.*, § 15126.6, subd. (f)(3).) [¶] The process of selecting the alternatives to be included in the EIR begins with the establishment of project objectives by the lead agency. 'A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . . The statement of objectives should include the underlying purpose of the project.' ([Guidelines], § 15124, subd. (b).)" (*Bay-Delta, supra*, 43 Cal.4th at p. 1163.)

Here, the LRDP identified six objectives and an underlying purpose for the development plan. The six objectives are (1) "Expand partnerships and collaborations to enhance [the] Lab's scientific and technical base";

(2) "Provide flexibility to return staff from its off-site facilities leased in Berkeley and Oakland to the main site in order to enhance collaboration, productivity, and efficiency"; (3) "Expand the capacity of existing high-demand advanced facilities and provide broader functionality"; (4) "Rehabilitate facilities that have outlived their intended purpose and can be cost-effectively adapted for use in new regions of scientific discovery"; (5) "Replace single-purpose facilities with new facilities programmed to accommodate multiple disciplines with advanced infrastructure suitable for future endeavors"; and (6) "Construct new scientific facilities to support future research initiatives and continued growth in existing programs."

The underlying purpose of the LRDP "is to guide the physical development of land and facilities and to provide a framework for implementing the [Lab's] mission and scientific goals." Consistent with this purpose, the LRDP is founded on "four fundamental principles," two of which are to " 'build a more campus-like research environment' " and to " 'improve access and connections to enhance scientific and academic collaboration and interaction.' " In turn, these "fundamental principles" underscore the importance of physical proximity in realizing the overall objectives of enhancing "collaboration, productivity, and efficiency."

In keeping with these objectives, the LRDP proposes the development of "clusters," which "would allow the Lab to evolve into a more campus-like setting," by "developing clusters of research and academic uses close to one another," thereby "fostering interaction and informal encounters among Lab staff and supporting the 'team science' heritage of the Lab."

In light of the foregoing, the EIR concluded that the offsite alternative "would not meet the project objectives to expand functionality of Lab facilities, provide for cross-disciplinary research, or foster collaborative work environments among researchers, since it would result in a division of resources between locations."

■ We are not persuaded by plaintiffs' contention that the Regents should have considered a so-called "true no hillside growth" alternative, where all growth under the 2006 LRDP would occur at a satellite campus, such as the Richmond Field Station. "An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible. ([Guidelines, § 15126.6, subd. (a)]; see also *Goleta, supra*, [52 Cal.3d] at p. 574.)" (*Bay-Delta, supra*, 43 Cal.4th at p. 1163.) " 'Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.' [Citation.]" (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [185 Cal.Rptr. 41].) "When

the alternatives have been set forth in this manner, an EIR does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated. [Citations.]" (*Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 287–288 [152 Cal.Rptr. 585].)

In *Save San Francisco Bay Assn. v. San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908 [13 Cal.Rptr.2d 117] (*Save San Francisco Bay*), the court reviewed the approval of an EIR to build an aquarium on the San Francisco waterfront that involved placing pilings in the bay. (*Id.* at p. 916.) Opponents of the project objected that the EIR was deficient because it failed to consider an alternative waterfront location that did not require placing new fill in the bay. (*Id.* at p. 921.)

In affirming the administrative approval of the aquarium construction, the appellate court noted that the California Supreme Court in *Goleta, supra*, 52 Cal.3d 553, "stressed that the range of alternatives to be included in an EIR should focus on those that could 'feasibly' attain the basic objectives of the project, and that CEQA does not require the examination of alternatives that are so speculative, contrary to law, or economically catastrophic as to exceed the realm of feasibility. [Citation.] This principle is important for this case because the requirements for the aquarium project were very specific and limited in scope (waterfront access, proven attendance base, transportation and parking), which in turn severely limited the 'feasible' alternatives." (*Save San Francisco Bay, supra*, 10 Cal.App.4th at p. 922.)

As in *Save San Francisco Bay*, the size and scope of the 2006 LRDP for the Lab limits the number of alternatives that are both feasible and would accomplish most of the goals of the project. The Regents considered an offsite alternative that would have reduced some of the significant environmental impacts of the project to a less-than-significant level while still accomplishing at least some of the goals of the project. Under this alternative, all development under the 2006 LRDP would be divided between the hill site and at the Richmond Field Station. The EIR, however, concludes that "this alternative would not meet the project objectives to expand functionality of Lab facilities, provide for cross-disciplinary research, or foster collaborative work environments among researchers, since it would result in a division of resources between locations."

Indeed, the so-called true offsite alternative proposed by plaintiffs would prevent the realization of the project's primary objective of creating a more campus-like setting at the hill site, and would nullify most, if not all, of the other project objectives as well. Specifically, a complete offsite alternative would eliminate the project's objectives of expanding the capacity of existing

hill site facilities, as well as the rehabilitation and replacement of outdated hill site facilities. Arguably, the project objective of constructing new facilities could be supported at an offsite location, but the related goal of promoting "continued growth in existing programs" necessarily relates to development at the hill site. By reason of the previously approved project (i.e., the project approved under the 1987 LRDP), the vast majority of the facilities and staff are located at the hill site. The objectives of the current project are to expand and update the hill site even further and to consolidate Lab staff, all with the overarching goal of creating a more campus-like setting at the hill site. A complete offsite alternative, however, would result in the division of facilities and staff and would be contrary to the objective of creating a more cohesive Lab atmosphere.[5]

■ Although an EIR must consider a reasonable range of potentially feasible alternatives and compare their environmental impacts, it does not have to identify and analyze alternatives that would not meet a project's objectives nor does it have to discuss every possible permutation of alternatives. (See *Bay-Delta, supra,* 43 Cal.4th at p. 1162 [EIR for management plan for bay-delta water not deficient for failing to analyze alternative of reducing exports from delta where reduced export alternative would have prevented implementation of other plan objective of water supply reliability]; *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1502–1503 [19 Cal.Rptr.3d 1] [EIR not required to identify and analyze alternatives that would not meet project's objectives]; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715 [29 Cal.Rptr.2d 182] [EIR for subdivision not required to analyze density alternative that was legally infeasible].) ■ Here, if a partial offsite alternative would not meet the project objectives of creating a more campus-like setting and fostering a collaborative work environment, we fail to see how the EIR was deficient in failing to consider a complete offsite alternative. The range of alternatives was sufficient to fulfill CEQA's requirements.

b. *Project Objectives*

We likewise conclude that the Regents' rejection of the offsite alternative was supported by substantial evidence. According to plaintiffs, the "Regents violated CEQA by rejecting alternatives for failing to meet project objectives that were inadequately described and too narrowly defined." (Capitalization altered.) To the extent plaintiffs seek to challenge the EIR's description of the

---

[5] It does not appear that plaintiffs are suggesting that the "true off-site" alternative would encompass moving the existing facilities and staff to another location. However, to the extent they advocate moving the entire Lab to avoid interference with the project's objective of creating a cohesive, campus-like setting, such a suggestion presents obvious infeasibility concerns regarding financial and logistical issues.

project objectives, this issue was raised in neither the administrative proceedings nor the trial court. Accordingly, plaintiffs' challenge to the project objectives is not properly before this court. (See Pub. Resources Code, § 21177; *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 897 [50 Cal.Rptr.3d 799].) However, to the extent this claim seeks to challenge the sufficiency of the evidence supporting the EIR's rejection of the offsite alternative, we conclude that substantial evidence supports the determination that the offsite alternative would not achieve the Lab's objectives of creating a more campus-like setting with the goal of enhancing collaboration, productivity, and efficiency.

Fostering collaboration and team science is an integral goal of the 2006 LRDP. There is ample evidence in the record supporting the conclusion that physical proximity is a key to meeting the project's objectives. Statements made by the Lab's current and former directors underscore the importance of creating a campus-like setting with common areas to promote the free exchange of ideas. For example, in the Lab's 2005/2006 annual report, former director Steve Chu, explained that in "a culture of interdisciplinary problem-solving," it is beneficial to have the opportunity to "spontaneously" form "research partnerships . . . over lunch in the cafeteria, after seminars, and in social events." Chu further explained that, in a light of the Lab's history of maintaining a collaborative approach to science, he viewed a "major" part of his job as making the "collaborative environment even better."

Consistent with the goal of ameliorating the collaborative environment, the 2006 LRDP adopted project objectives and design guidelines based on the fundamental principle of bringing research and academic personnel together at the main hill site. As such, the project calls for the creation of six acres of central commons, including the development of research clusters to enable the Lab to evolve into a more campus-like setting.

Based on these facts, we conclude that substantial evidence supports the EIR's conclusion that the offsite alternative "would not meet the project objectives to expand functionality of Lab facilities, provide for cross-disciplinary research, or foster collaborative work environments among researchers, since it would result in a division of resources between locations."

2.  *Water Quality**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 818.

## III.   DISPOSITION

The judgment is reversed and the trial court is instructed to enter, consistent with this opinion, a new and different judgment denying plaintiffs' petition for writ of mandate. The Regents are entitled to recover their costs on appeal.

Ruvolo, P. J., and Reardon, J., concurred.

On April 7, 2010, and April 8, 2010, the opinion was modified to read as printed above.