Filed 5/13/14  Friends of Appleton-Wolfard Libraries v. City and County of San Francisco CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRIENDS OF APPLETON-WOLFARD LIBRARIES et al.,<br><br>      Petitioners and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>      Defendants and Respondents. | A136409<br><br>(San Francisco County<br>Super. Ct. No. CPF-11-511469) |

Petitioners Friends of Appleton-Wolford Libraries and Coalition for a Better North Beach Library and Playground appeal after the trial court denied their petition for writ of mandate challenging the approval of the North Beach Public Library and Joe DiMaggio Playground Master Plan Project (the project), which includes the demolition of an existing library and construction of a new library on a different portion of the project site.[1]  They contend a vote of the electors was required before approval of the library construction, that approval of the project violates San Francisco's general plan, and that the project approvals violate the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA) because of deficiencies in the environmental impact report (EIR) for the project.   We shall affirm the judgment.

---

[1] The defendants were the City and County of San Francisco (the City), the Board of Supervisors of the City and County of San Francisco, the San Francisco Public Library Commission, the San Francisco Planning Commission, and the San Francisco Recreation and Park Commission.  We shall refer to defendants collectively as "the City."

1

# I.  BACKGROUND

The project site consists of two parcels and a portion of roadway between them in the North Beach neighborhood of San Francisco.  One of the parcels, 701 Lombard Street (Assessor's Block 74, Lot 1) is a 4,119-square-foot triangular lot bounded by Lombard Street to the north, Mason Street to the east, and Columbus Avenue (which runs diagonally) to the south and west.  The lot is owned by the City, under the jurisdiction of the Recreation and Parks Department, and at the time the EIR was prepared was used as a commercial parking lot.  The other parcel, located at 2000 Mason Street and 661 Lombard Street (Assessors Block 75, Lot 1), is a 109,701-square-foot block bounded by Lombard Street to the north, Powell Street to the east, Greenwich Street to the south, and Columbus Avenue and Mason Street to the west.  The parcel is occupied by the Joe DiMaggio Playground, which includes outdoor play areas (i.e., bocce ball courts, children's play areas, tennis courts, a pool, and a multipurpose area with softball, volleyball, foursquare, and basketball courts) and the existing North Beach Branch Library.  The project site also includes a 195-foot portion of the Mason Street right-of-way, running between the two parcels, bounded by Columbus Avenue and Lombard Street.  The project would combine the two parcels and the Mason Street right-of-way into a single site bounded by Lombard Street to the north, Powell Street to the east, Greenwich Street to the south, and Columbus Avenue to the west.

The project would be implemented in two phases.  In phase one, the Mason Street right-of-way between Lombard Street and Greenwich Street would be closed to allow the park to expand and to accommodate the proposed new library building.  The remainder of this portion of the right-of-way would become a car-free plaza space.  The new North Beach Branch Public Library would be built on the triangular 701 Lombard Street parcel, and would extend partway into the former Mason Street right-of-way.  It would be approximately 8,500 square feet, 3,170 square feet larger than the existing library.  It would include a disabled-accessible entrance and elevator, three reading areas for books and materials (for adults, children, and teens), publicly accessible restrooms, and a workroom on the first floor.  The second floor would include a community/program room

that would be used for public programs such as preschool story time, craft programs, sing-along programs, workshops, computer training, chess club, and author readings. Upon completion of the new library, the existing library would be demolished, and the site would be graded for development as open space as part of the Joe DiMaggio Playground. In phase two of the project, the Joe DiMaggio Playground would be reorganized and improved. Among the improvements, the existing tennis courts and children's play area would be moved to different portions of the site, there would be additional recreation fields and basketball courts, and the vacated portion of Mason Street would be landscaped to provide seating and plaza space.

The controversy in this case arises from the demolition of the existing library building and construction of a new library on a different portion of the project site. The existing library was designed by Appleton & Wolfard Architects in the 1950's, and was built between 1958 and 1959 on a then-existing playground. It was one of eight branch libraries this firm designed in San Francisco between 1951 and 1966; according to the EIR, these buildings "reflect the City's greatest capital expenditure in the library modernization movement. Combined, they generally embody the principles of mid-twentieth-century American public library design and display a style that Appleton & Wolfard employed for libraries." The EIR described these libraries as "express[ing] residential character, scale, space planning, use of natural light, and an appreciation of craftsmanship, color, and texture that appear to draw strong influence from informal Scandinavian architectural designs of the period." For purposes of its analysis, the EIR treated the existing library, individually and in conjunction with several other Appleton & Wolfard libraries, as a potential historic resource, stating, "due to architectural merit and high level of physical integrity, the North Beach Branch Library appears eligible for the National Register/California Register . . . both individually and as a contributor to the potential [Multiple Property Listing]."

The existing library, however, does not meet current building, seismic, or disability access codes and does not have enough space to meet community library needs.

3

Due to the grade change on the site, the library is divided into four levels; it also lacks elevators and public restrooms.

The EIR concluded the project would cause two unavoidable significant impacts: (1) demolition of a historic architectural resource, and (2) demolition of a structure that would contribute to a cumulative impact on historic architectural resources. The EIR concluded that two mitigation measures—documentation of the existing library in accordance with standards established by the Historic American Building Survey, and installation of an interpretive display at or near the original library site—would reduce these impacts, but not to a less-than-significant level. Over the objections of petitioners, the City approved the proposed project.

Petitioners filed a petition for writ of mandate, alleging causes of action for violation of the City Charter, violations of CEQA, and violation of the City's General Plan. The trial court denied the petition for writ of mandate in its entirety. This appeal ensued.

## II. DISCUSSION

### A. No Violation of City Charter

The 1996 Charter of the City and County of San Francisco (hereinafter Charter)[2] provides in pertinent part: "No park land may be sold or leased for non-recreational purposes, nor shall any structure on park property be built, maintained or used for non-recreational purposes, unless approved by a vote of the electors."[3] (Charter, § 4.113(2).)

_____

[2] We take judicial notice of the City's Charter. (Evid. Code, §§ 452 & 459.)

[3] The 701 Lombard Street lot, the site of most of the proposed library, was acquired by eminent domain in 2007. The Resolution of Necessity authorizing the acquisition of the lot stated, "the City intends to use the property for the development and maintenance of open space under the Neighborhood Park Bond and Open Space Program." The City authorized use of money from the Open Space Fund to acquire the site. Under the City's Charter, real property acquired with monies from the Park, Recreation, and Open Space Fund are under the jurisdiction of the Recreation and Park Commission within the meaning of section 4.113 of the Charter. (Charter, § 16.107(e); see also Charter, § 16.107(a).) The City does not dispute that the 701 Lombard Street parcel constitutes park land.

Petitioners contend a library is a non-recreational use and, therefore, the new library may not be built on park property.

The Charter does not define recreational or non-recreational uses. A century ago, however, our Supreme Court considered whether a city could build a library on land dedicated for park purposes. (*Spires v. City of Los Angeles* (1906) 150 Cal. 64 (*Spires*).) An ordinance had declared the land in question was " 'a public place forever for the enjoyment of the community in general.' " (*Id.* at p. 65.) Assuming, without deciding, that this ordinance indicated the land had been dedicated as a public park, the court concluded a library could properly be placed on a portion of the land. (*Id.* at pp. 65–66.) In doing so, the court noted that hotels, restaurants, museums, art galleries, zoological and botanical gardens, and conservatories were commonly built in public parks, and concluded that libraries were equally "in aid of the enjoyment of the public." (*Id.* at pp. 66–67.) The court distinguished such buildings from city halls, fire stations, and jails, which would be prohibited on land dedicated to park purposes, stating: "[U]sing a portion of said dedicated property for a museum or art-gallery or conservatory or *library, designed for the recreation, pleasure, and enjoyment of the community in general*, is an entirely different proposition, and is a distinction generally recognized by the authorities. Public buildings such as we have last mentioned are for the benefit of the same public that enjoys the advantages of the park; there is nothing exclusive about it, and they are in fact erected and maintained as *additional and ancillary means to promote the recreation and pleasure of those to whom the enjoyment of the park is devoted*." (*Id.* at p. 67, italics added.) The court cited with approval an English case, *Attorney-General v. Corporation of Sunderland* (1876) 2 Ch.Div. 634 (*Sunderland*), which concluded that a library could properly be built on a small portion of land dedicated as " ' "a place of recreation." ' " (*Spires, supra*, 150 Cal. at pp. 67–68.) In doing so, one of the justices in *Sunderland* stated: " 'I cannot conceive anything more likely to conduce to the enjoyment of the walks and pleasure-grounds than the having [a museum, library, and conservatory] attached to them.' " (*Spires, supra*, 150 Cal. at p. 69, quoting *Sunderland, supra*, 2

5

Ch.Div. at p. 643.) Thus, according to *Spires*, *supra*, under California law, the use of public property for a library is not inconsistent with recreational use of the land.

Petitioners attempt to avoid this conclusion, however, by pointing to provisions of the City's General Plan. The Recreation and Open Space Element (ROSE) of the General Plan has, as one of its objectives (Objective 2), "Develop and Maintain a Diversified and Balanced Citywide System of High Quality Open Space." Policy 2.2, entitled, "Preserve existing public open space," provides in part: "Proposals for nonrecreational uses in public parks and playgrounds may arise in the future. Some may be for public facilities such as parking garages, streets and buildings, and for private or semi-public facilities. Development of this kind in parks and playgrounds should, without exception, be prohibited." Policy 2.4, entitled "Gradually eliminate nonrecreational uses in parks and playground [*sic*] and reduce automobile traffic in and around public open spaces," provides in part: "The City should gradually eliminate nonrecreational uses in its public open spaces. In the past parks and playgrounds have been used as sites for *public facilities such as libraries*, fire and police stations, sewer plants and schools. . . . [A]s *nonrecreational facilities such as these* become obsolete, the City is faced with the decision to renovate them or relocate them altogether. [¶] In cases where it is possible to provide services elsewhere it should be the City's policy to eliminate nonrecreational uses in parks and playgrounds, demolish the facility and return the site to open space use. . . . [¶] In cases where it is not presently possible to provide services elsewhere, the City should simply maintain the facility and not permit its expansion." (Italics added.) Petitioners argue that we must harmonize the provisions of the City's Charter—adopted in 1996 by the voters—with these pre-existing provisions of the General Plan, and that, accordingly, we should conclude that for purposes of the Charter, libraries are not recreational facilities, and a library may not, therefore, be constructed in a park without approval by the voters.

The City makes a multi-pronged argument against this conclusion. First, the City points out that the North Beach Branch Library, as well as other branch libraries, were

6

located on park property at the time the Charter was enacted.[4]  Moreover, the City notes, section 4.113(2) of the Charter prohibits any structure to be "built, *maintained or used* for nonrecreational purposes, unless approved by a vote of the electors."  (Italics added.)  If the voters intended non-recreational uses to include libraries, the City argues, they would have been prohibiting not only construction of libraries on park land, but also the continued use and maintenance of the libraries that were already located there.  This, the City argues, would be an absurd result, and we should avoid a construction of the Charter that leads to such a result.  (See *Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 975 (*Woo*) ["[W]e will not presume that the lawmakers (here, the voters) intended the literal construction of a law if that construction would result in absurd consequences."].)

Moreover, the City points out, the Charter is the City's constitution, and is " 'the supreme law of the City, subject only to conflicting provisions in the federal and state Constitutions and to preemptive state law.' "  (*Woo*, *supra*, 83 Cal.App.4th at p. 974; *Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 170.)  To adopt petitioner's argument, the City argues, would effectively subordinate the voter-adopted Charter to the City's General Plan.  This, the City contends, would be improper.  For this, it relies on *Brown v. City of Berkeley* (1976) 57 Cal.App.3d 223, 231, which states:  "To be valid, an ordinance must harmonize with the charter.  [Citation.]  An ordinance can no more change or limit the effect of the charter than a statute can modify or supersede a provision of the state Constitution."

We find the City's arguments persuasive.  In any case, whether or not libraries are properly considered recreational uses of park land for purposes of the Charter, we agree with the City's contention that this issue is now moot.  While this appeal was pending, the voters of San Francisco approved the relocation of the library.  In 2012, the voters passed Proposition B, the Clean and Safe Neighborhood Parks Bond.  (Gen. Elec., Nov. 6, 2012.)  This measure asked the voters:  "To improve the safety and quality of neighborhood parks across the city and waterfront open spaces, enhance water quality

---

[4] The parties do not dispute that five branch libraries are located in City parks.

7

and clean up environmental contamination along the Bay, replace unsafe playgrounds, fix restrooms, improve access for the disabled, and ensure the seismic safety of park and recreation facilities, shall the City and County of San Francisco issue $195 million dollars in General Obligation bonds, subject to independent oversight and regular audits?" (Ballot Pamp., Gen Elec. (Nov. 6, 2012) Proposition B, p. 62.)  The digest in the ballot pamphlet described the proposal as follows:  "Proposition B is a bond measure that would authorize the City to borrow up to $195 million by issuing general obligation bonds to fund repairs and improvements of the City's parks and public open spaces."  (Ballot Pamp., Gen. Elec. (Nov. 6, 2012) Ballot Simplification Committee's Digest of Measure B, p. 62.)  It explained that the City planned to use the bond funds for various purposes, including "neighborhood park repairs and renovations" at a variety of parks, including Joe DiMaggio Playground.  (*Ibid*.)

Section 3 of the legal text of Proposition B, entitled "Proposed Projects," stated, "The capital projects and related activities eligible for financing under this Bond (the 'Projects') include the construction, reconstruction, renovation, demolition, environmental remediation and/or improvement of park, open space, and recreation facilities, under the jurisdiction of, or maintained by, the Recreation and Park Commission or the Port Commission or any other projects, sites or properties otherwise specified herein and all works, property and structures necessary or convenient for the foregoing purposes, as summarized and further described in the subsections below." (Ballot Pamp., Gen. Elec. (Nov. 6, 2012) text of Prop. B., p. 119.)  Subsection A of section 3, entitled "NEIGHBORHOOD PARK REPAIRS AND RENOVATIONS," read: "The City plans to pursue neighborhood park projects to be financed by the Bonds with the goal of improving the access of residents of the City to safe and high quality parks and recreation facilities.  The City has identified the following projects (the 'Identified Projects') for funding from the proceeds of the proposed Bonds.  In connection with Section 3A.7., *the Board of Supervisors, in Motion No. 11-91, affirmed certification of the North Beach Public Library and Joe DiMaggio Playground Master Plan Project Final Environmental Impact Report [Citation] and, in Ordinance No. 102-11, adopted*

8

*CEQA findings related to approvals in furtherance of the abovementioned Master Plan.* For purposes of this Ordinance, the Board relies on said actions and their supporting documents, including the Master Plan, copies of which are in Clerk of the Board of Supervisors File Nos. 110615 and 110312, respectively, and incorporates these documents by reference. *In addition and upon approval of the voters voting on this proposition, this Ordinance shall specifically authorize the design, uses, and facilities contained in the Master Plan, including relocation of the new North Beach Public Library to Assessor's Block 74, Lot 01, a parcel within the Master Plan site, as approved in Recreation and Park Commission Resolution No. 1104-023.* Said Resolution is incorporated herein by reference and is subject, without limitation, to revision by the Recreation and Park Commission in its sole discretion. The other Identified Projects set forth in this Section 3A have been determined to be categorically exempt under CEQA as set forth in the Planning Department's memoranda dated April 30, 2012 and May 14, 2012, which determination is hereby affirmed by this Board." (*Ibid*., italics added.) Section 3A concludes by listing the 15 parks that will be affected by the bond measure, including the Joe DiMaggio Playground. (*Ibid*.) Therefore, the City argues, this court cannot grant effective relief on the cause of action for violation of the Charter because the only available relief—a vote of the people approving the relocation of the library—has already taken place.

Petitioners contend the approval of Proposition B does not render this cause of action moot. They argue that Proposition B is a bond measure to improve parks, not a library measure, that the reference to the North Beach Branch Library is "buried" in the text of the proposition, and that the voters were not specifically asked "to determine whether a library, a non-recreational facility, could be constructed on open space." We are satisfied that the text of Proposition B adequately informed the voters that they were approving construction of the new library building in a park. Most of the text of section 3A, "NEIGHBORHOOD PARK REPAIRS AND RENOVATIONS," discussed the North Beach Public Library and Joe DiMaggio Playground Master Plan Project; the text "specifically authorize[d]" the relocation of the library, and it noted that the new location

9

was "within the Master Plan site, as approved in Recreation and Park Commission Resolution No. 1104-023." (Ballot Pamp., Gen. Elec. (Nov. 6, 2012), text of Prop. B., p. 119.) This text was sufficient to inform the electorate that the new library building would be constructed in a park.

Nor are we persuaded by petitioners' argument that Proposition B violated the single subject rule. The City's charter provides: "An ordinance shall deal with only one subject matter, except that appropriations ordinances may cover appropriations with respect to any number of subjects." (Charter, § 2.105.) In discussing similar state constitutional provisions (Cal. Const., Art. II, § 8 [initiatives], and Art. IV, § 9 [statutes]), the court in *San Joaquin Helicopters v. Department of Forestry* (2003) 110 Cal.App.4th 1549, 1555–1556, noted that the purpose of the rule was "to prevent 'logrolling' in the enactment of laws. This disfavored practice occurs when a provision unrelated to a bill's main subject matter and title is included in it with the hope that the provision will remain unnoticed and unchallenged." The court went on to explain that " '[a] measure complies with the rule if its provisions are either functionally related to one another or are reasonably germane to one another or to the objects of the enactment.' " (*Id*. at p. 1556; see also *Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1096.) The title of Proposition B is "Clean and Safe Neighborhood Parks Bond," and its expressed purposes are to issue bonds to improve the safety and quality of neighborhood parks and waterfront open spaces, enhance water quality, replace unsafe playgrounds, fix restrooms, improve access for the disabled, and improve seismic safety. (Ballot Pamp., Gen. Elec. (Nov. 6, 2012), p. 62.) We are confident that a proposal to relocate the North Beach library as part of a project that would renovate and improve the park within which it is located is reasonably germane to the objects of Proposition B.

This is not a case such as *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351, upon which petitioners rely. There, the Court of Appeal invalidated a proposed initiative measure for no-fault insurance. Two brief provisions addressing campaign contributions and conflicts of interest of officials who receive such contributions were placed in the middle of the lengthy document. The Court of Appeal

10

found no apparent connection between those provisions and the initiative's stated purpose of reining in insurance premiums. (*Id*. at pp. 358–361.) The same cannot be said here. The proposal to relocate the library was not hidden in the text of Proposition B, and it bore an easily discernible relation to the proposition's state purpose. We see no violation of the single subject rule.

## B. General Plan Consistency

Petitioners also contend the project violates the City's General Plan. As we have explained, the ROSE provides in part: "Proposals for nonrecreational uses in public parks and playgrounds may arise in the future. Some may be for public facilities such as parking garages, streets and buildings, and for private or semi-public facilities. Development of this kind in parks and playgrounds should, without exception, be prohibited." Policy 2.4, entitled, "Gradually eliminate nonrecreational uses in parks and playground [*sic*] and reduce automobile traffic in and around public open spaces," provides in part: "The City should gradually eliminate nonrecreational uses in its public open spaces. In the past parks and playgrounds have been used as sites for *public facilities such as libraries*, fire and police stations, sewer plants and schools. . . . [A]s *nonrecreational facilities such as these* become obsolete, the City is faced with the decision to renovate them or relocate them altogether. [¶] In cases where it is possible to provide services elsewhere it should be the City's policy to eliminate nonrecreational uses in parks and playgrounds, demolish the facility and return the site to open space use. . . . [¶] In cases where it is not presently possible to provide services elsewhere, the City should simply maintain the facility and not permit its expansion." (Italics added.) Petitioners contend the rebuilding of the library would violate these policies.

Every city and county must adopt a " 'comprehensive, long-term general plan for the physical development of the county or city . . . .' (Gov. Code, § 65300.) The general plan has been aptly described as the 'constitution for all future developments' within the city or county. [Citations.] '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its

elements.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571.)

In reviewing a claim that a project is inconsistent with a general plan, we are mindful "that no project could completely satisfy every policy stated in the [general plan], and that state law does not impose such a requirement. . . . Once a general plan is in place, it is the province of elected . . . officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the . . . officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the . . . officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719–720.) In other words, " '[a] project is consistent with the general plan " 'if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' " [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be "compatible with" the objectives, policies, general land uses and programs specified in the general plan. [Citation.]' [Citation.] [¶] A city's determination that a project is consistent with the city's general plan 'carries a strong presumption of regularity.' " (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 238.) Here, the City found the project was consistent with its General Plan, citing the facts that it would add needed open space to the North Beach and Chinatown areas, which are a "high needs area" for the addition of open space, that the expanded park would include an improved children's play area and other amenities, and that the project would promote Objective Two of the ROSE element of the General Plan that aims to develop and maintain a citywide system of high quality public open space.

A public entity's flexibility in interpreting its own general plan is not unbounded, and "[a] project is inconsistent if it conflicts with a general plan policy that is

12

fundamental, mandatory, and clear." (*Endangered Habitats League v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats League*).) The court in *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332 (*Families Unafraid*) concluded a project was inconsistent with a general plan policy requiring certain development types to be contiguous. (*Id*. at pp. 1338–1339.) Similarly, in *Endangered Habitats League*, the court ordered a county's approval of a project to be set aside where the project was inconsistent with the county's general plan that required particular levels of service at certain intersections as computed using a specified methodology, and that required all new development to comply with all specific plan policies. (*Endangered Habitats League*, 131 Cal.App.4th at pp. 783–787, 789.)

Thus, in both *Families Unafraid* and *Endangered Habitats League*, the projects undermined the general plans' fundamental land use policies. The same cannot be said here. Policy 2.2 of the ROSE is to "[p]reserve existing public open space." Policy 2.4 is to "[g]radually eliminate nonrecreational uses in parks and playground[s] and reduce automobile traffic in and around public open spaces." The effect of the project as a whole will be to *increase* the amount of open space on the project site (in part by eliminating traffic in the block of Mason Street that borders the park). Moreover, the general plan contemplates the possibility of the continuing existence of libraries in parks. The project will not result in the development of a new library in an area where none had existed before, but instead will relocate an existing use to another portion of the expanded park.

Petitioners suggest that this reasoning would lead to the conclusion that the City could eliminate open space in one neighborhood if it found comparable open space elsewhere. But that is not the case here. The new library site is adjacent to the existing park that houses the current library, and under the project the two parcels will be linked by a pedestrian area. On the facts of this case, we cannot conclude that the General Plan includes a policy that is "fundamental, mandatory, and clear" prohibiting such a project. The City could reasonably conclude the project would further the objectives and policies of the General Plan related to parks and open space.

13

**C. CEQA Challenges**

Petitioners make a number of challenges to the adequacy of the EIR.  In reviewing an agency's determination under CEQA, our task is to "determine whether the agency prejudicially abused its discretion.  [Citation.]  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence.  The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document.  [Citations.]  An adequate EIR must be 'prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.'  [Citation.]  It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'  [Citation.]  The court  must uphold an EIR if there is any substantial evidence in the record to support the agency's decision that the EIR is adequate and complies with CEQA."  (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 25–26 (*Dry Creek Citizens*).)

Moreover, "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.  [Citation.]  The absence of information in an EIR does not per se constitute a prejudicial abuse of discretion.  [Citation.]  A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process."  (*Dry Creek Citizens*, *supra*, 70 Cal.App.4th at p. 26.)

*1.     Project Description and Environmental Setting*

Petitioners contend the EIR for the project is inadequate because it failed to describe accurately the project and its environmental setting.  As we have explained, the City acquired the triangular lot at 701 Lombard Street in 2007 using open space funds.  The lot was being used as a parking lot at the time the EIR was prepared, as it had been since 1985.  In calculating the net amount of additional open space the project would

14

produce, the EIR treated the 701 Lombard Street triangle as a parking lot, rather than as existing open space. Thus, the EIR explained, "By relocating the library to the 701 Lombard site, currently used as a parking lot, demolishing the existing library, and converting the former library site into recreational open space, the project allows for the consolidation and expansion of recreational and open space use at Joe DiMaggio Playground and the elimination of a parking lot use. The project would result in a net increase of 12,010 square feet of public open space over existing conditions . . . ." This additional open space was the result of removing the existing library and vacating the Mason Street right-of-way.

Petitioners contend the EIR should have treated the 4,119-square-foot parking lot at 701 Lombard Street as existing open space that would be eliminated when the new library was built, and should therefore have deducted those 4,119 square feet from its calculation of the new open space created by the project. Thus, according to petitioners, the amount of open space created by the project should have been calculated as approximately 7,900 square feet.[5] Their argument is based on the Charter, which, as we have explained, provides that real property acquired with monies from the Park, Recreation, and Open Space Fund are under the jurisdiction of the Recreation and Park Commission within the meaning of section 4.113 of the Charter (Charter, § 16.107(e); see also Charter, § 16.107(a)); section 4.113 of the Charter, in turn, provides that no structure on park property may be built, maintained, or used for non-recreational purposes without the approval of the voters (Charter, § 4.113(2)). Thus, petitioners argue, the 701 Lombard Street lot is legally open space and should have been treated as such in the EIR. As a result, they claim, both the project description and the description of the environmental setting were misleading.

An EIR must contain both an "accurate, stable and finite project description" and a description of the environment in the vicinity of the project. (*San Joaquin*

---

[5] There are minor discrepancies between petitioners' calculations and those in the EIR. They do not affect our resolution of the issues on appeal.

15

*Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722, 730.)  The State CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines))[6] require an EIR to include a description of the project that contains:  (1) a map showing the precise location and boundaries of the proposed project and a regional map showing the location of the project; (2) a "statement of the objectives sought by the proposed project," which will help the lead agency develop a reasonable range of alternatives and aid the decision makers in preparing findings or a statement of overriding considerations; (3) a "general description of the project's technical, economic, and environmental characteristics," and (4) a "statement briefly describing the intended uses of the EIR."  (Guidelines, § 15124.)  As explained in *Dry Creek Citizens*, "[a] project description that omits integral components of the project may result in an EIR that fails to disclose the actual impacts of the project."  (*Dry Creek Citizens*, *supra*, 70 Cal.App.4th at p. 26.)

Petitioners do not identify any way in which the EIR fails to include the information required by the Guidelines, and do not identify any authority holding that a project description must include information on legal restrictions on future use of the project site.  Rather, at the heart of their challenge is the contention that without the information that the triangle parcel was acquired with open space funds, the EIR does not allow the decision makers or the public to evaluate properly the project's environmental effects or to weigh the project against possible alternatives.

The Guidelines provide that a project's environmental impacts are to be measured against the baseline physical conditions in the project area.  Under section 15125, subdivision (a) of the Guidelines, "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice

---

[6] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083.  In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

16

of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." Thus, the baseline conditions from which environmental effects are measured are normally existing physical conditions, not conditions that might exist in the future. (See *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 561.)[7]

Here, there is no dispute that "physical environmental conditions" on the triangle parcel at 701 Lombard Street include the parking lot. Under the Guidelines, the EIR could properly use these conditions to measure the environmental changes caused by the project, and the City could properly include the site of the existing parking lot in calculating the open space created as a result of the project.[8]

Petitioners argue, however, that the EIR violated section 15125, subdivision (d) of the Guidelines, which requires an EIR to "discuss any inconsistencies between the proposed project and applicable general plans, specific plans, and regional plans." The EIR included a discussion of possible inconsistencies: In its discussion of "Project

---

[7] Recently, in *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 451–452, our Supreme Court concluded that in unusual cases, projected future conditions may be used as the sole baseline for an impacts analysis, and that in appropriate circumstances a baseline might take into account environmental conditions that will exist when the project begins operations.

[8] Petitioners contend that the EIR's asserted error in treating the triangular Lombard Street parcel as a parking lot infects the EIR's analysis of alternatives to the project. In a self-contradictory argument, they contend that for purposes of measuring the open space created by the project, the 4,119 square feet on the triangle site should not be included—because it must be legally treated as open space—but, with no explanation, argue that for purposes of measuring the open space created by the alternatives, the very same 4,119 square feet should be included in the new open space. Therefore, they argue, the alternatives would create more open space than would the proposed project. We see no basis to treat the 4,119 feet differently when evaluating the proposed project than when evaluating the alternatives.

Location and Site Characteristics," the EIR noted that the triangle parcel was under the jurisdiction of the Recreation and Parks Department. In its discussion of land use impacts, the EIR noted that ROSE Policy 2.4 identified libraries as a non-recreational use and called for gradual elimination of such uses, and prohibited construction of parking lots on developed public open space. The discussion continued: "By relocating the library to the 701 Lombard site, currently used as a parking lot, demolishing the existing library, and converting the former library site into recreational open space use, the project allows for the consolidation and expansion of recreational and open space use at Joe DiMaggio Playground and the elimination of a parking lot use." The EIR's discussion concluded that on balance, the project appeared to further the general intent of Policy 2.4 as opposed to conflicting with it. Appendix B of the EIR, entitled "General Plan Policies, Goals, Objectives and Potential Physical Conflicts," noted in connection with ROSE Policy 2.4, "Phase 1 of the proposed project would create an expanded library within land under the jurisdiction of the San Francisco Recreation and Park Department." Moreover, the responses to comments, contained in the Final EIR, included comments to the effect that because of the eminent domain proceedings, the 701 Lombard Street parcel should be considered existing open space for purposes of calculating the amount of open space created by the projects. The response discussed the circumstances in which the parcel was acquired, explained that "the 701 Lombard Street parcel was acquired by the City through eminent domain for use in the expansion and reorganization of the existing Joe DiMaggio Playground," and noted that after a trial in the eminent domain action, the trial court had issued a statement of decision finding that the City's action was supported by testimony that the site "could provide additional green space in District 3, one of the most underserved districts for open space and parkland in the city," and that "the acquisition could help expand the North Beach library." The response also explained that because existing conditions are the baseline from which environmental effects are measured, the EIR's analysis did not treat the parking lot as existing open space. Although petitioners disagree with these conclusions, we conclude the EIR adequately informed the City and the public that the 701 Lombard Street lot was within the jurisdiction of the Recreation

18

and Parks Department and could be developed only in a manner consistent with limitations on use of park property.

### 2.    *Alternatives*

An EIR must "describe a range of reasonable alternatives to the project, or to the location of the project which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (Guidelines, § 15126.6, subd. (a); see also *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1353–1354.)  However, "[a]n EIR need not consider every conceivable alternative to a project.  Rather, it must consider a reasonable range of *potentially feasible* alternatives that will foster informed decisionmaking and public participation."  (*Id*. at p. 1354; see also *Jones v. Regents of University of California* (2010) 183 Cal.App.4th 818, 828 (*Jones*) [EIR need not discuss "every possible permutation of alternatives."].)  "In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.'  '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . .' [¶] The Legislature has defined 'feasible,' for purposes of CEQA review, as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' [Citations.]  Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' " (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 565.)  "The 'key issue' is whether the range of alternatives discussed fosters informed decisionmaking and public participation.  [Citations.]  [¶]  ' "Absolute perfection is not required; what is required is the production of information sufficient to permit *a reasonable choice* of alternatives so far as environmental aspects are concerned." [Citation.]' [Citation.]  When an EIR discusses a reasonable range of alternatives

19

sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed." (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 354–355.)

The EIR considered four alternatives to the proposed project: (1) a No Project Alternative, under which the site would not be changed; (2) a Preservation and Rehabilitation Alternative, under which the library would remain within its existing footprint and would be renovated to meet seismic stability and accessibility requirements; (3) a Preservation and Southerly Expansion Alternative, under which the existing library would be renovated and a 4,300-square-foot addition would be built to the south; and (4) a Three-Story Library Alternative, under which a new three-story library would be constructed on the 701 Lombard Street parcel without expanding or modifying its existing lot lines, and the existing library would be demolished.

The EIR also included a briefer discussion of six alternatives that had been considered but rejected. These included three additional preservation and expansion alternatives: one in which the library would be expanded to the north of the existing library (in the existing location of the bocce courts), one in which it would be expanded to the east (in the existing location of the tennis courts), and one in which it would be expanded vertically. The remaining rejected alternatives were one in which a new library would be built but the existing building would be retained and used for other purposes, one in which the library's rooftop would be used for recreation space, and one in which a new library would be built off-site.

Petitioners contend the range of alternatives studied in detail in the EIR was inadequate and that the EIR should have studied in detailed an alternative under which the existing library would be expanded to the north. We review the City's determinations regarding alternatives for substantial evidence. (*Preservation Action Council v. City of San Jose*, *supra*, 141 Cal.App.4th at p. 1352; *Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 315.)

Petitioners argue that of the four alternatives studied, only one—preservation and southerly expansion—*both* met most of the project objectives *and* reduced the project's

20

significant effects, and that this single alternative did not constitute a "range."  The EIR explained that the objectives for the project included:  expanding the library; ensuring that key library program elements were on one floor; ensuring that the program room and restrooms were accessible for community use after regular library hours; ensuring the library was seismically safe and accessible under the Americans with Disabilities Act (ADA); providing functional and safe staff spaces; ensuring adequate space for infrastructure; increasing the civic presence and visibility of the library from Columbus Avenue; improving visual access and connection between uses; ensuring safe and efficient passage between the library and the playground; minimizing or avoiding disruptions to library service during construction; improving the playground; maintaining all existing park program elements; increasing recreational open space; unifying the park and new library, and enhancing "connectivity between park amenities."

The EIR explained that the no project alternative would not meet most of the project sponsors' objectives, because, inter alia, it would not expand the library, increase accessibility or seismic safety, increase open space, or increase connectivity between park amenities.  The preservation and rehabilitation alternative would also not meet most of the objectives:  it would retain a library that was inefficient to operate, would not expand the library (and would in fact reduce usable floor area between four and ten percent to accommodate an elevator and ADA accessibility improvements), might displace a tennis court for construction of an elevator, would partially interrupt library services during elevator construction, and would not enhance "connectivity between park features."  It would, however, make the library compliant with seismic standards and improve ADA accessibility.  The preservation and southerly expansion alternative would meet several of the project objectives:  it would expand the library and make it accessible, provide a welcoming facility, and increase open space.  However, it would require more square footage, the existing library would impede access between the 701 Lombard Street parcel and the remainder of the Joe DiMaggio Playground, and park features would remain disjointed and would be displaced.  The final alternative studied, the three-story library on the 701 Lombard Street parcel, would meet most of the project sponsor's

21

objectives, but would not avoid the project's significant environmental effect of destroying the old library.

We agree with the City that these alternatives are sufficient to "foster[] informed decisionmaking and public participation." (Guidelines, § 15126.6, subd. (a).) The EIR examines in detail three alternatives that would preserve the existing library, and two of them—preservation and restoration of the existing library, and preservation and southerly expansion—would satisfy some or most of the project's objectives. These alternatives were not mere variations on the same theme, but rather comprised a range of possible ways to improve the library: renovate the existing library without expanding its footprint, expand the existing library, and move the library to a different portion of the project site. Moreover, the EIR explained why the alternatives of constructing a new library off-site or using the existing library for a different use while building a new library on the 701 Lombard Street parcel were infeasible or would not meet most of the project's objectives, and petitioners do not challenge these conclusions. Given the physical constraints of the site, we cannot fault the City for choosing this range of alternatives to study in detail in the Draft EIR. (See *Citizens for Open Government v. City of Lodi*, *supra*, 205 Cal.App.4th at pp. 312–315 [range of alternatives adequate although there was no alternative that would both feasibly attain most project objectives and avoid significant impacts].)

Indeed, petitioners do not suggest any other *type* of alternative the EIR should have studied, but instead argue the EIR was deficient because it failed to consider in detail another expansion alternative—that is, expansion of the existing library to the north, rather than to the south. But this alternative can reasonably be viewed as a "permutation" on the southerly expansion already studied (see *Jones*, *supra*, 183 Cal.App.4th at p. 828), and the EIR explains why it rejected this alternative: a northerly expansion of the library would displace the existing bocce courts, and the 701 Lombard Street parcel was an inappropriate location for the courts. The expansion would not be "visually subordinate to the existing library," and could reduce the existing library's "historic integrity." The library would be closed for 18 to 24 months during the

22

renovation, although bookmobiles would be offered at or near the project site. In addition, the expanded library would separate the open space at the 701 Lombard Street parcel from the rest of the park by increasing the size of the building, and would "diminish visual permeability into and through the site by creating a continuous building wall."

Moreover, in response to comments advocating the northerly expansion alternative, the Final EIR included an expanded discussion of that alternative, which briefly compared its environmental effects to those of the proposed project and the southerly expansion alternative, and set forth in greater detail the reasons the northerly expansion alternative would be inferior to both the proposed project and a southerly expansion alternative. It explained, "the proposed project would place a building at the edge of the expanded playground, whereas the Preservation and Northerly Expansion Alternative would place a building within the playground." The Final EIR also explained that this would be the case even if a smaller addition were built, as proposed in comments on the Draft EIR. We have examined the EIR and the diagrams of the project site, and agree that substantial evidence supports the EIR's conclusions. Moreover, petitioners suggest no particular way in which the northerly expansion alternative was superior to or significantly different from the southerly expansion alternative. In the circumstances, the EIR was not deficient for failing to study the northerly expansion alternative in even greater detail.

### III.    DISPOSITION

The judgment is affirmed.

23

                                     _____

                                     Rivera, J.

We concur:

_____

Ruvolo, P.J.

_____

Humes, J.