Filed 3/16/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MAKE UC A GOOD NEIGHBOR et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>     Defendants and Respondents,<br><br>RESOURCES FOR COMMUNITY DEVELOPMENT et al.,<br><br>     Real Parties in Interest. | A165451<br><br>(Alameda County Super. Ct. No. RG21110142)<br><br><br>**ORDER GRANTING PETITION FOR MODIFICATION AND MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Respondents' petition for modification is GRANTED.  The opinion filed on February 24, 2023, shall be MODIFIED as follows:

1.  On page 3, the first sentence in Background A. is replaced in its entirety as follows:  "Each UC campus periodically adopts a long range development plan, a high-level planning document that helps guide the university's decisions on land and infrastructure development.  (See Ed. Code, § 67504, subd. (a)(1).)"

2. On page 16, in the second full paragraph, the second sentence is replaced in its entirety as follows: "Moreover, Good Neighbor's argument ignores the problem that the rejected alternative in this case (capping future enrollment) would change the nature and scope of the project."

3. On page 29, in the last sentence of the second full paragraph, the word "their" is substituted for the word "its," so that the sentence reads: "While the Regents could have chosen to include all their properties in a single plan, that is far different from saying that separate plans serve no logical purpose or could not be implemented independently."

4. On page 34, in the first sentence of the first full paragraph of subsection 3, the phrase "will cause a potential noise increase" is deleted and replaced with "may potentially cause a noise increase."

5. On page 36, in the final sentence of the first partial paragraph, the word "waved" is substituted for the word "waived," so that the sentence reads as follows: "None of this can be waved away as speculation, unsubstantiated opinion, or bias."

6. On pages 44-45, in the second sentence of the Disposition, the words "and displacement" are deleted, so that the sentence reads as follows: "The matter is remanded to the superior court with directions to vacate its order and judgment denying Good Neighbor's petition for writ of mandate and enter a modified judgment consistent with our conclusions that the EIR inadequately analyzed potential alternatives to Housing

Project No. 2 and impacts from noise.  (CEQA, § 21168.9, subd. (a).)"

The modifications make no change to the judgment.

Dated:  ___03/16/2023___          _____Jackson, P.J._____, P.J.

Alameda County Superior Court, No. RG21110142, Hon. Frank Roesch.

Law Offices of Thomas N. Lippe, APC, Thomas N. Lippe; Soluri Meserve, A Law Corporation, Patrick M. Soluri, Osha R. Meserve, and James C. Crowder, for Plaintiffs and Appellants.

The Sohagi Law Group, PLC, Nicole H. Gordon, Margaret M. Sohagi, Mark J.G. Desrosiers; Lubin Olson & Niewiadomski LLP, Charles R. Olson, Philip J. Sciranka; Office of The General Counsel – University of California, Charles F. Robinson, Alison L. Krumbein; UC Berkeley, Office of Legal Affairs, David M. Robinson, for Defendants and Respondents.

Buchalter, A Professional Corporation, Douglas C. Straus, Alicia Cristina Guerra, for Real Party in Interest Resources for Community Development.

4

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MAKE UC A GOOD NEIGHBOR et al., | |
| Plaintiffs and Appellants, | A165451 |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | (Alameda County Super. Ct. No. RG21110142) |
| Defendants and Respondents; | |
| RESOURCES FOR COMMUNITY DEVELOPMENT et al., | |
| Real Parties in Interest. | |

This case concerns the adequacy of an environmental impact report, or EIR, for (1) the long range development plan for the University of California, Berkeley through the 2036-2037 academic year; and (2) the university's immediate plan to build student housing on the current site of People's Park, a historic landmark and the well-known locus of political activity and protest. Appellants Make UC a Good Neighbor and The People's Park Historic District Advocacy Group (collectively, Good Neighbor) challenge the EIR's sufficiency as to both.

As we will explain, we are unpersuaded by Good Neighbor's contention that the EIR was required to analyze an alternative to the long range development plan that would limit student enrollment. We also reject Good Neighbor's view that the EIR

1

improperly restricted the geographic scope of the plan to the campus and nearby properties, excluding several more distant properties. Nor did the EIR fail to adequately assess and mitigate environmental impacts related to population growth and displacement of existing residents.

Two of Good Neighbor's arguments, however, find more traction. The EIR failed to justify the decision not to consider alternative locations to the People's Park project. In addition, it failed to assess potential noise impacts from loud student parties in residential neighborhoods near the campus, a longstanding problem that the EIR improperly dismissed as speculative.

We are, of course, aware of the public interest in this case— the controversy around developing People's Park, the university's urgent need for student housing, the town-versus-gown conflicts in Berkeley on noise, displacement, and other issues, and the broader public debate about legal obstacles to housing construction. We do not take sides on policy issues. Our task is limited. We must apply the laws that the Legislature has written to the facts in the record. In each area where the EIR is deficient, the EIR skipped a legal requirement, or the record did not support the EIR's conclusions, or both.

Finally, our decision does not require the Regents to abandon the People's Park project. However, they must return to the trial court and fix the errors in the EIR. As explained more below, whether CEQA will require further changes to the project depends on how the Regents choose to proceed and the results of the analyses they conduct. Ultimately, CEQA allows an agency to approve a project, even if the project will cause significant environmental harm, if the agency discloses the harm and makes required findings. The point of an EIR is to inform decisionmakers and the public about the environmental consequences of a project before approving it.

2

# BACKGROUND

## A.

Each UC campus is required periodically to adopt a long range development plan, a high-level planning document that helps guide the university's decisions on land and infrastructure development. (See Ed. Code, § 67504, subd. (a)(1).) The plan at issue here, adopted in 2021, estimates future enrollment for planning purposes but does not determine future enrollment levels or set a limit on the campus's future population. It does, however, establish a maximum amount of new growth that the university may not substantially exceed without amending the plan and conducting additional environmental review.

UC Berkeley provides housing for only 23 percent of its students, by far the lowest percentage in the UC system. For years, enrollment increases have outpaced new student housing (or "beds"). The prior long range development plan, adopted in 2005, called for construction of just 2,600 beds through 2021. This was 10,000 beds short of the projected enrollment increases over the same period. The university only constructed 1,119 of those planned beds. Making matters worse, within two years of adopting the 2005 plan, the university increased enrollment beyond the plan's 2021 projection. By the 2018-2019 academic year, student enrollment exceeded the 2005 projections by more than 6,000 students. With a population of 39,708 students, the university provides housing for fewer than 9,000.

This has transpired in the midst of a decades-long regional housing crisis. A report by a UC Berkeley task force convened to address this "matter of urgent concern" identified a menu of options that could significantly expand student and faculty housing, including numerous potential housing development sites. Informed by the report, the UC Berkeley chancellor's office launched a housing initiative to improve existing housing and construct new housing for students, faculty, and staff.

The 2021 plan encompasses a general strategy for meeting the housing goals identified in the chancellor's initiative. The university anticipates (but is not committed to) constructing up to 11,731 net new beds to accommodate a projected increase in the campus population (students, faculty, and staff) of up to 13,902 new residents. In addition, the plan projects that another 8,173 students, faculty and staff will be added to the population by the 2036-2037 academic year who will not be provided with university housing.

**B.**

Good Neighbor's lawsuit is based on the California Environmental Quality Act (CEQA).[1] The "foremost principle" under CEQA is that the Legislature intended that it " 'be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 *(Laurel Heights)*.)

An EIR, the "heart of CEQA," (Guidelines, § 15003, subd. (a)), is, with narrow exceptions, required whenever a public agency proposes to undertake or approve a project that may have a significant effect on the environment. (*Laurel Heights, supra,* 47 Cal.3d at p. 390.) Its purpose is to provide public agencies and the general public with detailed information about the proposed project's likely environmental impacts; to list ways those effects might be minimized; and to identify alternatives to the project as proposed. (CEQA, § 21061; *Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226,

---

[1] All references to "CEQA" are to the California Environmental Quality Act. (Pub. Resources Code, § 21000 et seq.) All references to "Guidelines" are to the state CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

235 (*Save Berkeley's Neighborhoods*).) The EIR protects the environment and helps ensure enlightened public debate by " ' "inform[ing] the public and its responsible officials of the environmental consequences of their decisions *before* they are made." ' " (*Save Berkeley's Neighborhoods,* at pp. 235-236; *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944.)

The most common type of EIR, a project EIR, examines the environmental impacts of all phases of a specific development project, including planning, construction, and operation. (Guidelines, § 15161; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169 (*Bay-Delta*).) A program EIR, in contrast, is often used at a relatively early stage of the planning process, before specific components of the program are ready for approval. (See Guidelines, § 15168, subds. (a)-(c).) "An advantage of using a program EIR is that it can '[a]llow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts.' " (*Bay-Delta,* at p. 1169; Guidelines, § 15168, subds. (a), (b)(4).) Program EIRs are commonly employed in conjunction with "tiering," the use of project EIRs to analyze the environmental impacts of detailed proposals that were not addressed by the program-level planning document. (*Bay-Delta,* at p. 1170.)

## C.

The EIR at issue here is a hybrid: it encompasses both a program EIR intended to identify and assess potential environmental impacts from the approval and implementation of the long range development plan and a more detailed, project-level environmental review to analyze the potential impacts of two specific developments proposed for People's Park (Housing Project No. 2) and a site not at issue in this appeal, the Helen Diller Anchor House (Housing Project No. 1). While these

5

housing projects are conceptually part of the university's long range development plan, they are also separate projects for purposes of CEQA (see CEQA, § 21065) and are analyzed separately in the EIR when required.

Respondents Regents of the University of California certified the EIR and approved the housing projects in July and September 2021. In October 2021, Good Neighbor filed a (first amended) petition for writ of mandate naming the Regents, University of California President Michael Drake, and UC Berkeley Chancellor Carol Christ (collectively, Regents). The writ petition alleges multiple CEQA violations and asks the court to void the approvals of the development plan and housing projects, void the certification of the EIR, and suspend all related activities pending compliance with CEQA.

Following various procedural skirmishes, in August 2022 the trial court denied the writ petition and entered judgment in favor of the Regents. Good Neighbor appealed and filed a petition for writ of supersedeas and request for immediate stay in this court, seeking to preserve People's Park from demolition pending resolution of its appeal. We granted the stay and subsequently issued a writ of supersedeas ordering that all construction and further demolition, tree-cutting, and landscape alteration activities at People's Park be stayed pending resolution of the appeal. We now turn to Good Neighbor's appellate challenges to the adequacy of the EIR.

## DISCUSSION

### A.

### *Alternatives to the development plan*

Good Neighbor argues the Regents violated CEQA by failing to analyze an alternative to the development plan that would limit student enrollment. We disagree.

6

## 1.

As noted, the purpose of an EIR is to provide the government and the public with enough information to make informed decisions about the environmental consequences of a project and ways to avoid or reduce its environmental damage. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564-565 (*Goleta*).)

To that end, an EIR must consider potentially feasible alternatives to a project. (*Goleta, supra,* 52 Cal.3d at p. 565; see Guidelines, §§ 15126.6, subd. (a), 15364.) The lead agency—not the public—is responsible for proposing the alternatives. (*Goleta,* at p. 568.) The lead agency need not consider every conceivable alternative but instead a reasonable range of alternatives to the project, or to the project's location, that could reduce a project's significant environmental impacts, meet most of the project's basic objectives, and are at least potentially feasible. (Guidelines, § 15126.6, subds. (a)-(c), (f); see generally, 1 Kostka & Zischke*, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2022) §§ 15.7-15.9 (Kostka & Zischke).)

When reviewing a challenge to the alternatives, courts apply the rule of reason: " 'the EIR [must] set forth only those alternatives necessary to permit a reasoned choice' and . . . 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1163, quoting Guidelines, § 15126.6, subd. (f).) Courts presume an EIR complies with this rule; it is a petitioner's burden to demonstrate it does not. (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987 (*California Native Plant Society*).) We must defer to the Regents' selection of alternatives unless Good Neighbor (1) demonstrates the alternatives selected by the Regents are " ' " ' manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives' " ' " and (2)

identifies evidence of a potentially feasible alternative that meets most of the basic project objectives. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 345 (*South of Market*).) The inquiry concerns predominantly factual issues, to which we apply the substantial evidence standard. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 435 (*Cleveland National Forest*).)

**2.**

Below, we provide further background on the alternatives evaluated in the EIR as well as information on the university's enrollment process.

The development plan will provide general guidance for the campus's land development and physical infrastructure. (See Ed. Code, § 67504, subd. (a)(1) [Legislature intends long range development plans to "guid[e] . . . physical development, including land use designations, the location of buildings, and infrastructure systems, for an established time horizon"].) The plan includes an estimate of future enrollment but does not set enrollment levels, require enrollment increases, or commit to any amount of enrollment or development. The EIR lists 14 objectives, mostly comprising broad goals for land use, landscapes, open space, mobility, and infrastructure.

Based on the purpose and objectives, the EIR identifies eight alternatives for the plan. It excluded four alternatives from full consideration for various reasons, and it fully analyzed the remaining four.

In the fully analyzed group, alternative A (the no project alternative) would entail continuing to implement the old (2005) development plan. That plan includes constructing up to 1,530 additional beds as well as 2,476,929 square feet of academic and other space—far less than the proposed development plan (11,731

8

beds and over three million square feet of other space). The old plan omits Housing Project Nos. 1 and 2 as well as features in the proposed plan to reduce vehicle miles traveled, upgrade utilities, increase energy efficiency, and add renewable energy systems.

Alternative B is described as a reduced development plan. It envisions a 25 percent reduction in new undergraduate beds and academic square footage (9,479 total new beds and 1,713,441 square feet of academic space) compared with the proposed plan. The two housing projects would be included but would be reconfigured and smaller, with a commensurate reduction in beds.

Alternative C focuses on features that would reduce vehicle miles traveled and greenhouse gas emissions through numerous projects to increase remote learning and working, limit parking, and build 500 more faculty and staff beds to reduce commuting.

Alternative D prioritizes more housing for faculty and staff compared to the proposed development plan—an additional 1,000 beds in two campus locations.

The EIR analyzes each alternative's environmental impacts topic-by-topic, compares them to the proposed plan, measures them against the objectives, and determines which alternative is environmentally superior. The EIR concludes that alternative A (no project) would be the environmentally superior alternative, followed by alternative C (reduced vehicle miles). Except for alternative A, which would conflict with many of the plan's objectives, the remaining alternatives would meet most of the objectives.

Among the four alternatives that were eliminated from consideration without a detailed analysis in the EIR, the Regents considered an alternative that focused on reducing the number of future graduate students. This alternative was rejected because, according to the EIR, it would undercut a "core" project

9

objective—to support and enhance UC Berkeley's status as a leading public research institution.

In comments on the draft EIR, members of the public urged the Regents to consider an alternative that reduced, capped, or otherwise limited undergraduate enrollment. The Regents responded, in the final EIR, that the plan does not set undergraduate enrollment, increase enrollment, or commit the campus to any particular enrollment level; enrollment is determined annually in a separate process.

As the EIR explains, the process for setting enrollment levels in the UC system is complicated, with multiple players, interests, and trade-offs. By statute, the UC system (as a whole) must plan for adequate space to accept all eligible California resident students who apply as well as eligible transfer students. (See Ed. Code, §§ 66011, subd. (a), 66202.5, 66741.) The California Master Plan for Higher Education requires the system to accept the top 12.5 percent of the state's public high school graduates and eligible transfer students from community colleges. The Legislature sometimes uses the budget process to inject itself into the enrollment debate, as it did in 2016, prompting the largest annual enrollment increase in resident students since World War II, and in 2017, when the university agreed to cap enrollment of nonresident students.

To find places for these students, the university's Office of the President coordinates enrollment annually in an iterative process with 10 UC campuses, each of which has different enrollment goals and different demands for its academic programs. UC Berkeley is the second-largest campus in the system. The physical capacity of a campus is just one factor in setting enrollment levels; in recent years, four UC campuses, including UC Berkeley, together exceeded their planned capacity by 12,000 students. The Office of the President tracks existing and projected enrollment data, as well as annual and long-term

10

plans for the numbers and types of students that can be accommodated at each campus. The university prepared its last long-term enrollment plan in 2008 for a 13-year period; it is currently developing a new long-term plan.

**3.**

The main issue is whether Good Neighbor has demonstrated that the range of alternatives in the EIR is manifestly unreasonable. (*South of Market*, *supra*, 33 Cal.App.5th at p. 345.) Good Neighbor does not really quarrel with the EIR's alternatives as far as they go. Rather, it argues that the EIR's range is too narrow without at least one alternative that would limit student enrollment. It observes that the number of students is a major driver of environmental impacts. Fewer students would mean, for example, fewer cars and new buildings, which, in turn, would mean fewer impacts to resources protected by CEQA such as air, water, and cultural resources. Good Neighbor also points to other UC campuses that have settled disputes with neighboring communities by agreeing to link enrollment increases to housing—for example, UC Davis's agreement to provide on-campus housing for new students over a baseline figure.

The problem with Good Neighbor's argument is that it ignores the plan's limited purpose and scope. The plan deliberately keeps separate the complex annual process for setting student enrollment levels.

An agency is generally not required to consider alternatives that would change the nature of the project. (*Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652 (*Marin Municipal*); see Kostka & Zischke, *supra,* § 15.8.) In *Marin Municipal*, a water agency adopted a moratorium on new water connections in response to a drought that caused an acute water shortage. In its EIR, aside from the no-project alternative, the agency considered just one alternative to address the crisis—

11

mandatory water conservation.  (*Id*. at pp. 1657, 1665.)  The petitioners argued the agency should have considered more comprehensive alternatives such as adopting a tiered rate system, developing reclaimed water, or securing other new supplies.  The court rejected the argument, emphasizing that the agency's objective was "not to solve the [agency's] long-term water supply problems; rather, its more modest goal was to prevent an immediate over-commitment of the [agency's] water supply."  (*Id*. at p. 1666.)  It held that the range of alternatives was reasonable.  (*Ibid*.; compare *Cleveland National Forest, supra,* 17 Cal.App.5th at pp. 435-437 [concluding range of alternatives was unreasonable when the purpose of a plan was to reduce greenhouse gas emissions, but the EIR included no alternative designed to reduce driving, the primary source of emissions].)

*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351 (*Rio Vista*) is also helpful.  A county adopted a program EIR for a hazardous waste management plan.  The county limited the scope of the plan to a high-level assessment of its need for new facilities and siting criteria for potential facilities.  It deliberately stopped short of proposing specific sites or development of actual facilities.  (*Id*. at pp. 370-372.)  The EIR analyzed three similarly high-level alternatives.  (*Id*. at p. 378.)  The court rejected the petitioner's argument that the county must consider more detailed alternative plans relating to site-specific issues, such as locating facilities outside the county or limiting the size of facilities.  (*Ibid*.)  The court observed that the alternatives in the EIR were "tailored to the nature of the Plan, in which site selection criteria, not specific sites, were proposed." (*Id*. at pp. 378-379.)  It held that the high-level alternatives in the EIR offered decisionmakers sufficient information to make a reasoned choice.  (*Id*. at p. 379.)

12

The holdings in *Marin Municipal* and *Rio Vista* are reinforced by the process that agencies use to develop the alternatives. A lead agency begins by determining the project's purpose and objectives. (Guidelines, § 15124, subd. (b).) It then uses the purpose and objectives to develop a reasonable range of alternatives to analyze in the EIR. (*Ibid.*; *Bay-Delta*, *supra*, 43 Cal.4th at p. 1163.) This exercise would be meaningless if, long after the EIR is certified, a court tells the agency that it was also required to consider alternatives that serve *different* purposes and objectives. Generally, when an agency has deliberately limited the scope and nature of the problem that it wants to solve, the agency should not be required to consider alternatives that address a much bigger problem (*Marin Municipal*) or that add difficult issues the agency has chosen not to tackle (*Rio Vista*). The EIR's purpose and objectives will often reflect these kinds of limits.

Here, like in *Rio Vista*, the Regents adopted a program EIR for a limited, high-level land use plan and made a reasoned decision to exclude the enrollment process from the scope of the project. The EIR is quite clear that setting enrollment levels is *not* the plan's purpose. The purpose is to guide future development regardless of the actual amount of future enrollment. The plan leaves enrollment decisions to the existing long range and annual planning processes. It estimates future enrollment only for purposes of developing a land use and infrastructure plan that could meet its future needs, consistent with the Legislature's instruction to develop long range plans based on the campus's "academic goals and projected enrollment levels." (Ed. Code, § 67504, subd. (a)(1).)

Likewise, nearly all of the 14 project objectives in the EIR relate to land use and development goals, not enrollment policy

13

for a public university.[2]  None of the objectives would have helped the Regents craft alternatives that address the public policy considerations, institutional values, and tradeoffs involved in limiting enrollment at its premier campus.  (See Guidelines, § 15124, subd. (b).)  Given the complexity of, and the competing interests in, setting annual enrollment levels, the Regents would presumably need to *add* objectives to the EIR to develop workable alternatives for limiting enrollment—which only emphasizes that Good Neighbor's favored alternative is a horse of a different color.

Notably, Good Neighbor does not argue that the objectives themselves are too narrowly drawn, which could certainly expand the nature and scope of the alternatives.  (See, e.g., *We Advocate Through Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683, 691-693; *North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647, 669.)  Nor does it argue that CEQA requires the Regents to combine the two processes (development and enrollment planning) into a single project.  In any case, we would reject that argument.  (See *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 279-282 [agencies may separate related projects when they serve different

---

[2] A typical objective is: "Maintain natural areas as well as generous natural and built open spaces on the Campus Park and the Clark Kerr Campus."  Other objectives concern bicycle and pedestrian networks and mobility; car access and parking; designing facilities for sustainability, efficiency, and seismic safety; efficient use of resources; open space; improving the housing portfolio; infrastructure; and historic landscapes and architecture.  The only objective arguably relevant to enrollment—at least for graduate students—calls for supporting UC Berkeley's status as an internationally renowned public research university by expanding its graduate schools and research programs.

14

purposes or can be implemented independently]; *Rio Vista, supra*, 5 Cal.App.4th at pp. 371-373.)

As in *Rio Vista* and *Marin Municipal*, the alternatives in the EIR are tailored to the plan's limited purpose. The alternatives presented the Regents with a variety of ways to meet the plan's objectives while reducing the plan's significant impacts. The range of alternatives include less development (Alternative B); strategies to reduce carbon emissions by building more housing near the campus, reducing parking, and increasing remote instruction and working (Alternative C); and more housing for faculty and staff located on the campus itself (Alternative D). Importantly, although the alternatives do not include *reducing* the total campus population, they do include *managing* the campus population in ways that could lessen or avoid its impacts by, for example, reducing car travel to the campus; providing more housing for people on campus rather than the surrounding community; and reducing the daily campus population through remote working and instruction. In text, tables, and charts, the EIR explains how, to varying degrees, the alternatives would meet or conflict with different objectives, analyzes the impacts, and proposes mitigation measures. Other than making the general point that some impacts could also be mitigated or avoided by an alternative that reduces the future campus population, Good Neighbor does not explain what is wrong with the alternatives in the EIR.

We do not find Good Neighbor's remaining arguments persuasive.

First, Good Neighbor attacks the Regents' contention that the Regents were excused from evaluating enrollment alternatives because either the alternatives would conflict with the objectives or they are infeasible. We need not reach those issues. Even assuming that an enrollment alternative poses no such conflict and is potentially feasible, we still must determine

15

whether the range of alternatives that the EIR *did* analyze meets the rule of reason. (See *South of Market*, *supra*, 33 Cal.App.5th at p. 345; *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 420-421; Guidelines, § 15126.6, subd. (f).) Put another way, if the range of alternatives is reasonable, it does not become unreasonable simply because another potential alternative exists.

Second, Good Neighbor argues that the EIR must consider reducing enrollment as a means of reducing development and the impacts associated with development. It cites *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1087-1090 (*Watsonville Pilots*), in which a city rejected, without analysis, a reduced development alternative in its EIR for a general plan update. The court held that a reduced development alternative should have been included because it would meet most of the project objectives, reduce many of the project's environmental impacts (largely caused by growth), and address a gap in the range of alternatives. (*Ibid.*)

Unlike *Watsonville Pilots*, however, this EIR *did* include a reduced development alternative—alternative B, which would reduce housing and academic space development by 25 percent. Moreover, Good Neighborhood's argument ignores the problem that capping future enrollment levels would change the nature and scope of the project. That was not an issue in *Watsonville Pilots*. (See *Watsonville Pilots*, *supra*, 183 Cal.App.4th at pp. 1087-1088.)

Third, and finally, Good Neighbor notes that CEQA requires the Regents to consider future campus population estimates when they prepare an EIR for a long range development plan and to mitigate significant impacts. (See CEQA, § 21080.09, subds. (b), (d); Ed. Code, § 67504, subds. (a)(1), (b)(1).) Good Neighbor then suggests that, because the Legislature requires the Regents to mitigate impacts from

16

campus population increases, it must also consider alternative ways to avoid or reduce impacts when setting enrollment levels.

We do not see it that way.  We agree that the Regents must consider, and mitigate, projected campus population increases when the Regents prepare an EIR for a long range development plan, as we held in *Save Berkeley's Neighborhoods, supra,* 51 Cal.App.5th at pp. 237-241.  The EIR does so.  But nothing in CEQA section 21080.09 indicates that the Legislature intended to force the Regents to consider alternatives to its process for setting enrollment levels whenever they adopt a new development plan.  Indeed, in a recent amendment to the statute, the Legislature exempted enrollment and enrollment increases from the definition of a project under CEQA.[3]  (Sen. Bill No. 118 (2021-2022 Reg. Sess.), Stats. 2022, ch. 10, § 1, eff. March 14, 2022; CEQA, § 21080.09, subd. (d).)

Good Neighbor has not met its burden of demonstrating that the range of alternatives for the long range development plan is manifestly unreasonable.

**B.**

***Alternatives to Housing Project No. 2***
***(People's Park)***

We now turn to Good Neighbor's challenge to the alternatives analysis for Housing Project No. 2, which would be built on the present site of People's Park.  As noted, although this

---

[3]  For clarity, we note that the Legislature also recently exempted from CEQA student and faculty housing projects that meet certain criteria.  (CEQA, § 21080.58.)  The legislation (which became effective January 1, 2023) applies to site-specific housing projects that are consistent with a long range development plan.  (CEQA, § 21080.58, subd. (b)(1)(A)(i).)  It does not exempt long range development plans, which remain subject to CEQA.  (CEQA, § 21080.09, subd. (b).)

17

site-specific project is related to the long range development plan, and part of the same EIR, it is a separate project (for CEQA purposes) from the plan, and the EIR separately discusses alternatives to the plan and the housing project.

As explained in the previous section, CEQA requires that an EIR consider and analyze a reasonable range of potentially feasible alternatives to the project, or its location, that would attain most of its basic objectives but reduce its environmental impacts. (Guidelines, § 15126.6, subd. (a); *Bay-Delta, supra*, 43 Cal.4th at p. 1163.) Good Neighbor contends the EIR violated this mandate by failing to analyze any alternative locations for Housing Project No. 2 that would spare People's Park from demolition.

We agree, to a point. We do not hold the Regents must necessarily study an alternative site or sites for the People's Park project. We are mindful that an analysis of alternative sites is not required in all cases. (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 993.) Here, however, the Regents not only declined to analyze any alternative locations; they failed to provide a valid reason for that decision. (Guidelines, § 15126.6, subd. (f)(2)(B).) There is plenty of evidence that alternative sites exist—the development plan identifies several other university-owned properties as potential student housing sites. (See *Goleta, supra*, 52 Cal.3d at p. 574 [public agency's access to alternative sites may expand the range of feasible alternative locations].) Under these circumstances, we are constrained to find the EIR failed to consider and analyze a reasonable range of alternatives.

**1.**

In the 1960's, the university acquired and cleared the parcel that eventually became People's Park, intending to develop it for parking, student housing, and office space. Funding for the project ran short, and the site remained undeveloped. Over the following year, residents, students, and community organizers

18

transformed it into an unofficial community gathering space—People's Park.

The park's historic significance stems from its association with social and political activism in Berkeley. A hub of protest against the Vietnam War, in 1969 the park was the site of both violent confrontations between protesters and law enforcement and peaceful demonstrations. Through the early 1970's, People's Park grew to symbolize anti-war activism and suppression of the counterculture movement. Since those times, various proposals by the Regents to develop the site have been met with protest and/or community opposition.

The park is currently used as a venue for occasional special events, including concerts, fairs, basketball tournaments, and theatrical performances. Its predominant use, however, is by transient and unhoused people in multiple encampments. The park is also afflicted with crime, ranging from disturbing the peace and drug and alcohol violations to much more serious offenses including sexual assault, arson, and attempted murder.

The City of Berkeley designated the park as a landmark in 1984. There are 10 historic structures in its immediate vicinity, buildings of two to four stories dating from the 19th- and early 20th-century. These include two National Register-listed resources: the First Church of Christ, Scientist, and Anna Head School for Girls.

To build the housing project, the Regents propose demolishing the park and its amenities and constructing two new buildings. The new buildings would provide approximately 1,113 student beds, eight staff and faculty beds, and 125 beds for lower-income and formerly homeless persons. The project would include a public market, a clinic, and some 1.7 acres of publicly accessible, landscaped green space that would commemorate the history and legacy of People's Park.

The EIR determined the project would result in a substantial adverse change to a historic resource: "Housing Project [No.] 2 would require demolition of existing structures, which currently include a public restroom, basketball courts, and stage, and would reconfigure the existing open space. . . . These proposed changes would leave the park without integrity of design, materials, workmanship, feeling, or association, that is, it would remove its ability to convey its historic significance. Therefore, demolition of the site would result in a *significant* impact." Nobody disputes that, under CEQA, the Regents properly identified this as a significant impact on the environment. (Guidelines, § 15064.5, subds. (a)(2), (b)(2)(A)-(b)(2)(B).)

In addition, Housing Project No. 2 could have significant and unavoidable impacts on the 10 historic resources in the vicinity because its proposed scale and proportion, with a larger footprint and height of up to 17 stories, would likely be incompatible with the smaller structures.

The EIR does not analyze in detail any alternatives to Housing Project No. 2. In the EIR scoping process, the staff identified two alternatives before rejecting them. The first was intended to preserve the park by designing buildings that would maintain the park's key features. The EIR explains that staff concluded this was not possible and rejected the idea. The parties focus on the second rejected alternative, which suggested locating the housing project on one of the many other university-owned properties in the area.

The EIR gives three reasons for rejecting the alternative location proposal. First, "[l]ocating [the project] on other UC Berkeley properties in the City Environs Properties or the Clark Kerr Campus that are designated for future student housing could reduce the total projected number of beds within the proposed LRDP Update development program . . . , or could

20

require UC Berkeley to identify additional housing sites that are not currently UC Berkeley properties for housing."

Second, development of the project at a different location "would be constrained by site access and parcel size, as many of the eligible sites are smaller than the proposed development sites. Therefore, the development programs would need to either be reduced, or the housing projects would require multiple sites, further diminishing the total number of beds described in the proposed [long range] development program."

Third, relocating the project would not avoid adverse historical impacts: "While a potential alternate site alternative would reduce the significant historic resource impacts at both [Anchor House and People's Park] sites, they would also have the potential to introduce new historic resource impacts at many of the sites in the City Environs Properties and the Clark Kerr Campus, as both contain historic resources or are adjacent to such resources."

In comments on the draft EIR, members of the public asked what specific sites were considered as potential alternatives for Housing Project No. 2. The final EIR responded by identifying numerous potential housing sites that the plan also proposes for new development, redevelopment, and renovation. Like the draft EIR, the final EIR stated that developing Housing Project No. 2 on one or more of those sites would result in fewer beds and potentially introduce new historic resource impacts. In addition, the final EIR stated that "accommodating the same number of beds on multiple sites would cause greater potential for ground disturbance and thus consequently, greater construction impacts." The Regents adopted the conclusions stated in the draft EIR.

21

## 2.

The Regents' strategy is puzzling. It can be risky to adopt an EIR that analyzes *no* potentially feasible alternatives. It is especially risky here given that the university owns several other nearby properties that it has designated, in its development plan, as sites for student housing. So if the Regents wanted to consider potentially feasible sites for student housing that would avoid impacts to the park, there are some obvious candidates. Moreover, the Regents concede that, if there are no feasible alternative locations for the project, the EIR should state the reasons for that conclusion. (Guidelines, § 15126.6, subds. (c), (f)(2)(B); *Laurel Heights*, *supra*, 47 Cal.3d at p. 404 [agency cannot expect the public to accept its determination on blind trust].) But the record does not support the reasons stated in the EIR, and the Regents do not try to defend them. Instead, in their brief, they offer new reasons that contradict their earlier reasons and that are nowhere found in the EIR.

The EIR's first reason, again, is that developing an alternative site instead of People's Park "*could*" either reduce the total number of beds that would be built under the long range development plan or require the university to acquire additional properties. This vague, equivocal statement—maybe an alternative site would reduce the total beds, maybe not—falls short of a conclusion, based on facts and analysis, that no potentially feasible sites exist. (See Guidelines, §§ 15126.6, subds. (c), (f)(2)(B) ["If the Lead Agency concludes that no feasible alternative locations exist, it must disclose the reasons for this conclusion"], 15364 [defining feasibility as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors"], 15126.6, subd. (f)(1) [feasibility includes assessing whether the developer "can reasonably acquire, control or otherwise have access to [an] alternative site"

22

or already owns one].)  Nor do the Regents point to evidence in the record that would shore up this assertion.

Moreover, the rationale is based on a nonexistent conflict with the long range plan.  The plan sets no minimum number of beds to be built.  Its objective for housing is to "[i]mprove the existing housing portfolio" and "support" the Chancellor's housing initiative by providing "additional" beds.  The total number of beds discussed in the plan—11,731—is not a hard number but, instead, merely "the estimated potential envelope of net new development that may occur over time," depending on actual enrollment growth, available financing, and other factors. The EIR acknowledges as much in considering a reduced development alternative—alternative B—that proposed 2,500 fewer beds.  The Regents are careful to say, repeatedly, that the plan is not a commitment to build anything, much less 11,731 beds.  Similarly, the Regents cite no evidence that acquiring new properties conflicts with the plan or is infeasible.  (See *Goleta, supra*, 52 Cal.3d at p. 574; Guidelines, § 15126.6, subd. (f)(1).)  The plan expressly contemplates acquiring additional properties in the future; it even sets guidelines for doing so.  In short, the alleged conflict with the plan does not support an infeasibility finding.

The second reason also is a non-starter.  The EIR explained that relocating the project to an alternate site or sites would result in fewer new beds, or require multiple sites, because "*many*" of the eligible sites are smaller than People's Park. (Italics added.)  Again, this is not a finding that there are *no* alternative sites that could support an equivalent project.  Nor does the EIR or administrative record supply evidence to support such an assertion.  (*See Goleta, supra,* 52 Cal.3d at p. 569; Guidelines, § 15126.6, subd. (c).)  In fact, the EIR indicates that at least three of the nearby sites identified for student housing could provide more beds than the 1,113 beds at the People's Park

site: Clark Kerr – Central (1,439 net new beds); Channing Ellsworth (2,980 beds); and Fulton-Bancroft (1,200 beds).

The third reason is similarly flawed. The EIR ruled out consideration of alternate locations in part because re-siting the project from People's Park would "have the *potential*" to adversely affect other historic resources at "*many* of the sites in the City Environs Properties and the Clark Kerr Campus," as both areas "contain . . . or are adjacent to [historic] resources." (Italics added.) In other words, relocating Housing Project No. 2 from People's Park, where it will definitely destroy a significant historic resource, to many (but not all) of the sites in those areas might (but might not) affect some different historical resource because such a resource might (or might not) be on or near the site. This artfully drafted language, yet again, cannot substitute for a conclusion based on facts in the record that there are no potentially feasible alternative sites where the project would cause less damage to historic resources.

The EIR's rationale here is questionable for another reason as well: it treats potential adverse environmental impacts on People's Park and various other, unnamed historical resources as if they were interchangeable. Historical places and structures are rarely, if ever, fungible items of equivalent historical significance and value. Even were we to assume re-siting the project would cause adverse impacts to some other historic resource, those impacts would almost necessarily differ in quality and degree from Housing Project No. 2's impacts on People's Park.

The Regents cite no evidence to support the final EIR's additional reason that alternative sites would have a "greater potential for ground disturbance." We deem this point abandoned. (See *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 836.)

24

While an EIR need not exhaustively explain its reasons for excluding an alternative from analysis (Guidelines, § 15126.6, subds. (c), (f)(2)(B)), unsupported conclusory statements do not suffice. (*Laurel Heights, supra,* 47 Cal.3d at p. 404.) The Regents' explanation, premised as it is on ambiguous generalizations rather than analysis and evidence, failed to serve the purpose of enabling informed decision-making and public discussion. (See *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 750-751 [EIR's statement that development at another site "*may*" result in similar adverse impacts without discussing whether there actually were other potentially suitable sites held insufficient]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 735-736 (*San Joaquin Raptor*).)

**3.**

In their briefs, the Regents spend most of their time developing new reasons for declining to analyze any alternative sites for Housing Project No. 2.

First, they argue that a "primary objective" of the project is to revitalize the People's Park site, and therefore developing any other site would conflict with that objective. (See Guidelines, § 15152, subd. (a); *Jones v. Regents of University of California* (2010) 183 Cal.App.4th 818, 827-828 (*Jones*) [upholding rejection of alternative site because it would conflict with most project objectives].) The Regents point to one of the EIR's seven objectives for Housing Project No. 2: "[r]edevelop and revitalize a UC Berkeley property to provide safe, secure, high quality, and high density student housing to help meet the student housing needs of UC Berkeley." While they acknowledge the reference to "a" UC Berkeley property does not convey a site-specific objective of addressing problems unique to People's Park, they maintain the record "clearly" demonstrates that this is what it meant.

25

We disagree. The objective applies equally to many of the potential sites that the university has identified for redevelopment in its long range development plan. This is unsurprising. One of the plan's objectives is to provide "renovated safe, secure, accessible, and high-quality housing." The plan therefore identifies a host of underutilized, university-owned properties as potential sites to redevelop as student housing, including the three alternative properties mentioned above (Clark Kerr – Central, Channing Ellsworth and Fulton-Bancroft) and Housing Projects Nos. 1 and 2, all of which the EIR categorizes as redevelopment housing projects. The record simply does not support the Regents' position that its objective to redevelop "a" UC Berkeley property fatally conflicts with redeveloping all other UC Berkeley properties.

The Regents summarily assert it is infeasible to construct Housing Project No. 2 on a different site because the university must utilize *all* of the proposed housing sites near Campus Park to achieve its objective of maintaining that area as the central location for academic, research and student life uses. The Regents identify nothing in the EIR or the record supporting their claim that the objective cannot be achieved without developing every potential site in the area. As noted, the Regents disclaimed any commitment to build anything other than the two housing projects; the other proposed sites, according to the EIR, are simply a "menu of possible options" for future development. In any event, the Regents may not exclude a potentially feasible alternative from analysis simply because it does not fully meet all project objectives. (*Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1304; *Watsonville Pilots*, *supra*, 183 Cal.App.4th at p. 1087.)

Finally, we would find the EIR flawed even if we accepted the Regents' argument. The primary explanation they offer now but omitted from the EIR (i.e., they did not consider other sites

26

because they want to fix the problems at this particular site) contradicts the explanation they gave to the public in the EIR (they considered other sites but found them infeasible because they were too small, etc.). In the chapter on alternatives, where the Regents stated their reasons for rejecting alternative sites, the Regents gave the latter explanation, not the former. When squarely asked by public commentors why they rejected other sites, they did so again. And again in the findings. Hiding the ball is unacceptable. In the seminal *Laurel Heights* case, in which the Regents failed to explain why they rejected alternative sites for a development project, our Supreme Court observed: "The Regents miss the critical point that the public must be equally informed" of the reasons. (*Laurel Heights, supra*, 47 Cal.3d at p. 404, italics omitted.) They missed that point here, too.

In sum, we conclude that, absent a viable explanation for declining to consider alternative locations, the range of alternatives in the EIR was unreasonable. (See *Watsonville Pilots, supra,* 183 Cal.App.4th at pp. 1087-1090.) Because the Regent's explanation was incomplete and inaccurate, it precluded informed public participation and decision-making, so it is prejudicial regardless of whether a different outcome would otherwise have resulted.[4] (CEQA, § 21005, subd. (a).)

---

[4] We note, again, that recent legislation exempts certain student and faculty housing projects from CEQA. (CEQA, § 21080.58, added by Sen. Bill No. 886 (2021-2022 Reg. Sess.), Stats. 2022, ch. 663, § 1, eff. Jan. 1, 2023.) Among other limitations, the legislation does not apply to student housing projects that would require the demolition of a structure listed on a local historic register. (CEQA, § 21080.58, subd. (d)(1)(D).) People's Park is a local historic landmark.

## C.

### *Piecemealing*

We reject Good Neighbor's argument that the Regents improperly "piecemealed" the long range development plan by limiting its scope geographically to the campus and neighboring properties, thereby excluding several properties further away. We review piecemealing claims de novo. (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1224 (*Banning Ranch*).)

Piecemealing concerns the scope of the project analyzed in the EIR. CEQA requires that a lead agency describe and analyze the entire project rather than split one large project into smaller ones, resulting in piecemeal environmental review that obscures the project's full environmental consequences. (Guidelines, § 15378; *Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1222.) It is not simply a matter of whether two projects are related. The projects must be linked in a way that logically makes them one project, not two. A classic example is *Laurel Heights*, where a university described the project only as its initial plan to occupy part of a building, omitting its future plan to occupy the entire building. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) Another example is a county's truncated description of a housing development that neglected to include the sewer lines and related facilities designed to serve the project. (*San Joaquin Raptor, supra,* 27 Cal.App.4th at pp. 729-731.)

But two projects may be kept separate when, although the projects are related in some ways, they serve different purposes or can be implemented independently. (See *Banning Ranch*, *supra,* 211 Cal.App.4th at pp. 1223-1224 [summarizing the case law]. An example is *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99, where the court concluded that a proposed hydrogen production facility at an oil refinery served a different purpose than a pipeline to transport

28

excess hydrogen from same facility, and thus could be evaluated in a separate EIR.

Here, Good Neighbor argues that the geographic distinction is "arbitrary" and that there is no "independent utility" to adopting separate plans for the remote properties because ultimately they are all part of the UC Berkeley campus and serve its educational mission.

In our view, however, it is perfectly rational for the university to develop a coherent vision for the campus and its adjacent properties while developing separate plans for more remote properties. When a group of projects are related geographically, the Guidelines encourage agencies to analyze them together as one large project in a program EIR, which is precisely what the Regents have done. (See Guidelines, § 15168, subd. (a)(1) [agency may prepare program EIR for a series of actions that can be characterized as one large project and are related geographically].) While the Regents could have chosen to include all its properties in a single plan, that is far different from saying that separate plans serve no logical purpose or could not be implemented independently.

As the EIR explains, the properties in the plan comprise all of UC Berkeley's major instructional facilities and are the primary locations used by nearly all the members of the campus population for instruction, research, and extracurricular activities. The plan itself sets goals and principles that focus on how the campus and adjacent properties function together (e.g., accessibility, connectivity), contribute to the university's institutional objectives (e.g., fostering collaboration), and will be used by the university community. We won't second guess the Regents' decision to group the campus-area properties together for planning purposes. (Cf. *Jones*, *supra*, 183 Cal.App.4th at p. 829 [rejecting argument that university was required to consider off-site alternative locations for campus laboratory, given

29

university's goals to foster collaboration and a culture of interdisciplinary problem-solving].)

Good Neighbor suggests that, because the Legislature requires each UC "campus" to have a long range development plan (Ed. Code, § 67504, subd. (a)(1)), all of UC Berkeley's properties must be included in a single plan, regardless of their proximity to the actual campus. The statute does not say so. (See Ed. Code, § 67504, subd. (a)(1).) We think it allows the Regents a measure of discretion on this point.

## D.

### *Noise*

We agree with Good Neighbor that—as to both the development plan and Housing Project No. 2—the EIR failed to analyze potential noise impacts from loud student parties in residential areas near the campus, where student parties have been a problem for years.

### 1.

CEQA includes "noise" as part of the " '[e]nvironment.' " (CEQA, §§ 21060.5, 21068.) The Legislature has declared that it is the state's policy to "[t]ake all action necessary to provide the people of this state with . . . freedom from excessive noise." (CEQA, § 21001, subd. (b).) As a general matter, the Regents concede that CEQA applies to the type of noise at issue here—crowds of people talking, laughing, shouting, and playing music that disturbs neighboring residents. (See, e.g., *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 732-734 [EIR required for crowd noise and music at wedding venue].)

In preparing an EIR, the lead agency must "consider and resolve every fair argument that can be made about the possible significant environmental effects of a project." (*Protect the*

30

*Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 (*Amador*).)  The agency must make findings in the EIR that such an effect either is, or is not, significant.  (*Ibid.*; CEQA, § 21100, subds. (b)(1), (c).)  A finding of insignificance requires only a brief statement of reasons, but a finding of significance triggers the requirement to consider mitigation measures.  (CEQA, §§ 21002.1, subds. (a), (b), 21100, subds. (b)(3), (c).)  Because the Regents did not consider and resolve whether noisy parties are a significant effect of the projects, the initial question for us is whether there is a fair argument, based on substantial evidence in the record as a whole, that they *may* be significant effects.  (See *Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 13, 17 (*Visalia*).)  If so, the Regent's failure to make findings one way or the other may have violated CEQA's procedural requirements.  (See *Amador*, *supra*, 116 Cal.App.4th at pp. 1111-1112.)

The fair argument standard is a low threshold, which reflects CEQA's preference for resolving doubts in favor of environmental review.  (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist*. (2013) 215 Cal.App.4th 1013, 1035 (*Taxpayers*).)  The lead agency cannot weigh conflicting evidence: if any substantial evidence exists of a potential significant effect, the agency must analyze the issue even if other evidence indicates that that the project will not have a significant effect.  (Guidelines, § 15384, subd. (a).)  Substantial evidence may include personal observations of residents, expert opinions, and reasonable inferences based on facts, but not argument, speculation, or unsubstantiated opinions.  (Guidelines, § 15384, subds. (a)-(b); *Taxpayers*, *supra*, at pp. 1035-1036.)  We owe no deference to the lead agency on its decision to forgo an analysis although we will give them some deference on disputed issues of credibility.  (*Taxpayers*, at p. 1035.)  Our standard of review is de novo.  (*Ibid*.)

**2.**

At oral argument, the Regents conceded that noise from student parties is a problem in Berkeley's residential neighborhoods near the campus. The record indicates it is a longstanding problem.

In 2007, the City of Berkeley found that parties in residential areas "frequently become loud and unruly," cause "excessive noise," and constitute a public nuisance, and it added a set of warnings and fines to its municipal code. (Berkeley Mun. Code, §§ 13.48.010–13.48.070). The city and university police implemented a joint public safety patrol and weekly reporting process to discourage such parties. Neighborhood groups submitted data of hundreds of citations under the ordinance but stated that enforcement efforts have flagged in recent years and that the parties and noise have increased.

In 2016, the City of Berkeley took further steps to mitigate noisy parties in these neighborhoods when it adopted an ordinance restricting so-called mini-dorms—private homes converted to high-density student housing (e.g., four-bedroom homes housing 12 to 14 students). The city found that these mini-dorms were disrupting the neighborhoods near the campus in numerous ways, including "loud and unruly parties" that "frequently" require police officers to respond. The city found the disturbances had "become much more severe and intolerable because they are no longer occasional, but have become chronic."

For several years, the university has engaged with neighbors and the city on the noise issue through an advisory body that, according to the EIR, "is dedicated to improving the quality of life in the neighborhoods adjacent to UC Berkeley properties." It has "launched and supported good-neighbor initiatives, campaigns, and programs" aimed at reducing noise from parties, as well as other conflicts. The advisory body "meets regularly" with the city and community stakeholders to hear

32

updates on the work they have done together and to plan new initiatives. Other materials in the record explain that neighbor groups have been meeting with the university since 2008 specifically to address noisy parties, and the university has provided funding for their efforts, beginning in 2011.

The EIR defines a significant noise impact as an increase in ambient noise that would exceed local standards, including Berkeley's noise ordinances. But the EIR does not analyze the issue: it does not address the relevant baseline noise conditions in the neighborhoods afflicted with loud parties, the effect of increasing the student population in those neighborhoods, or the efficacy of the noise reduction efforts it identified, and it makes no findings on whether adding thousands more students to the area would cause a significant noise increase.

Multiple individuals and organizations objected to the EIR's failure to address impacts from loud parties. The commentors include neighborhood groups that, in partnership with the university, have been trying to mitigate student noise for more than a decade. They submitted surveys, reports, and data indicating that the effort had been largely unsuccessful and that the number of such incidents had stayed the same or increased in all but one member neighborhood since 2011. They complained that the development plan proposes to triple the number of undergraduates living at the Clark Kerr campus without studying the potential noise impacts on the surrounding neighborhoods.

The Regents refused to analyze the issue because, according to the final EIR, it is "speculative to assume that an addition of students would generate substantial late night noise impacts simply because they are students."

**3.**

Although the Regents concede that loud student parties are a real problem in the residential neighborhoods, they insist there is no substantial evidence in the record that adding thousands more students will cause a potential noise increase.  Instead, the record contains only opinions and speculation that reflect an anti-student bias.  They say that "[n]ewer students could just as well spend more time studying or socializing quietly on the internet compared to prior students."

Similarly, their partner in the People's Park project, Resources for Community Development (RCD), says that Good Neighbor's argument is based on prejudice, stereotypes, and "tales from NIMBY neighbors" rather than evidence.  RCD warns that a ruling for Good Neighborhood will allow "NIMBY project opponents" to force affordable housing proponents to conduct noise studies based solely on biased opinions that poor and formerly homeless people are noisier than other neighbors.

As a general matter, we agree with the Regents and RCD that stereotypes, prejudice, and biased assumptions about people served by a CEQA project—such as a church, school, gym, or housing project—are not substantial evidence that can support a CEQA claim under the fair argument standard.  (See Guidelines, § 15384, subd. (a) [substantial evidence does not include argument, speculation, and unsubstantiated opinion].)  And we agree that the Legislature did not intend CEQA to be used as a redlining weapon by neighbors who oppose projects based on prejudice rather than environmental concerns.  (See Guidelines, §§ 15002, subd. (a) [purpose of CEQA is to prevent environmental damage], 15131 [CEQA applies to environmental, not social, impacts]; cf., *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 169-170 & fn. 5 (*Save the Plastic Bag*) [CEQA petitioner with "no demonstrable concern for protecting the environment" may lack standing].)

34

But here, this is a straw man argument. The Regents and RCD focus on isolated statements from a noise expert who referred to the movie "Animal House," offered colorful opinions about student attitudes toward drinking, and suggested the vast majority of loud and unruly drunk college students are male, not female. We will set those statements aside.

As the lead agency, the Regents are required to consider the *entire* record. (Guidelines, § 15384, subd. (a).) Quite a bit of proper evidence remains. We have no reason to assume, for example, that the City of Berkeley's noise ordinances are based on anti-student bias. The city found that "loud and unruly" student parties have gone from an "occasional" problem to one that is "chronic" and "intolerable." It has declared noise from parties to be a public nuisance. Data from enforcement efforts indicates that student parties consistently violate these ordinances. Neighborhood groups have worked for years to mitigate loud student parties. Based on their experience, observations, and neighborhood surveys, they say the mitigation efforts have been largely unsuccessful and that the noise problem has increased. The record also includes public comments based on personal observations that loud parties are an increasing problem. (See *Taxpayers*, *supra*, 215 Cal.App.4th at pp. 1035-1036 [substantial evidence includes " '[r]elevant personal observations of area residents on nontechnical subjects' "], 1054-1055 [neighbors' observations of traffic problems established fair argument of potential impact].)

Indeed, the Regents' argument is hard to square with their concession that loud student parties in these neighborhoods *are* a problem. For more than a decade, the university has partnered with the city and with neighborhood groups to discourage loud parties. It provided funding to neighborhood groups for this purpose. It collects data on the issue and meets regularly with the city and neighborhood groups to discuss progress and

potential new initiatives. Presumably the university said and did these things because the university agrees that student noise is a genuine problem and not because the university is prejudiced against its students. None of this can be waived away as speculation, unsubstantiated opinion, or bias.

The evidence meets the fair argument standard. Given the long track record of loud student parties that violate the city's noise ordinances (the threshold for significance), there is a reasonable possibility that adding thousands more students to these same residential neighborhoods would make the problem worse. (See Guidelines, Appendix G, XIII, subd. (a), § 15384, subd. (b) [substantial evidence includes reasonable assumptions predicated on facts].) The Regents' suggestion that new students might instead "socializ[e] quietly on the internet" is conjecture, unsupported by the record. (See *City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 858-859 [no substantial evidence supported university's assumption that 5,500 new students would not use regional parks].) New students arrive every year, yet the noise problem has persisted since at least 2007.

The Regents' additional arguments have no merit.

First, in a supplemental brief, the Regents assert that CEQA only applies to crowd noise generated at a "discrete facility" that is designed to host noisy crowds. (See, e.g., *Keep Our Mountains Quiet v. County of Santa Clara*, *supra*, 236 Cal.App.4th at pp. 732-734 [crowd noise at wedding venue].) They cite no authority for this sweeping rule. CEQA applies when it is reasonably foreseeable that a project may cause an impact, directly or indirectly. (CEQA, § 21065; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1198-1199; Guidelines, §§ 15064, subd. (d)(2), 15358, subd. (a)(2).) The geographic area of a potential impact is not limited to discrete facilities but includes any area where direct or indirect

impacts may occur. (Guidelines, § 15360; *Save the Plastic Bag*, *supra*, 52 Cal.4th at pp. 173-174; e.g., *Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 210 [EIR for sports arena considered indirect impacts on nearby neighborhoods of noise from crowds after they leave the arena].) These are settled principles of law, grounded in statutes, the CEQA Guidelines, and Supreme Court cases. The Regents make no attempt to explain why they do not apply here.

Second, the Regents assert Good Neighbor waived any challenge to the EIR's noise analysis because it presented some of its materials after the Regents approved the plan (but before they approved Housing Project No. 2). That is incorrect. Petitioners raised the noise issue in timely comments on the draft EIR and thus preserved the issue. (CEQA, § 21177, subds. (a), (b).)

Third, and finally, the Regents warn that this case will encourage existing homeowners to oppose "development of a single family home on the empty lot next door" unless the lead agency studies and mitigates "typical household noise" like "children playing or dogs barking." We are not sure what they mean. The scenario they posit is a frivolous CEQA claim under existing case law: the alleged impact is obviously insignificant (see Guidelines, Appendix G, XIII, subd. (a)), and it affects only isolated individuals rather than the environment of people generally. (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 196 [dismissing as insignificant CEQA claim by neighboring horse ranch that school project must address noise from "children laughing and playing"]; *Dunning v. Clews* (2021) 64 Cal.App.5th 156, 173-175 [malicious prosecution action for frivolous CEQA noise claim].) Nothing in this case suggests otherwise.

The Regents must analyze the potential noise impacts relating to loud student parties. Their decision to skip the issue,

based on the unfounded notion that the impacts are speculative, was a prejudicial abuse of discretion and requires them now to do the analysis that they should have done at the outset. (See *Amador*, *supra*, 116 Cal.App.4th at pp. 1111-1112; CEQA, § 21100, subds. (b)(1), (c).) We express no opinion on the outcome of a noise analysis. The Regents must determine whether the potential noise impacts are in fact significant, and, if so, whether mitigation is appropriate; ultimately, CEQA provides discretion to proceed with a project even if some impacts cannot be mitigated. (CEQA, §§ 21002, 21002.1, subds. (a)-(c), 21100, subds. (b), (c); see also, § 21168.9.)

## E.

### *Population Growth*

Good Neighbor contends the EIR violates CEQA because it failed to address properly the impacts of population growth and the consequent displacement of existing residents. We disagree.

### 1.

The EIR estimates that the long range development plan will add up to 13,902 residents to Berkeley for whom the university plans to provide housing. This population is comprised primarily of undergraduate and graduate students, graduate student family members, faculty, and staff. In addition to this "[d]irect" population growth, the EIR anticipated "[i]ndirect" population growth of another 8,173 residents in Berkeley and surrounding cities—students, faculty, staff and family members for whom the university would not provide housing.

The EIR's Population and Housing analysis concluded this influx of residents would result in two significant impacts if

unmitigated.[5]  First, the plan would induce substantial unplanned population growth "either directly (for example, by proposing new homes and businesses) or indirectly (for example, through extension of roads or other infrastructure)."  ("Impact POP-1.")  As mitigation, the university would provide Berkeley and the Association of Bay Area Governments (ABAG) with annual summaries of enrollment projections and housing production data to "ensur[e] that local and regional planning projections account for UC Berkeley-related population changes." As so mitigated, the impacts of unplanned population growth would be less than significant.

Second, the EIR found the development projects anticipated by the plan could result in displacing substantial numbers of existing residents, houses or businesses.  ("Impact POP-2.")  This impact was also found to be significant, but less than significant if mitigated by implementing the UC Relocation Assistance Act Policy to help displaced residents find replacement housing. Pursuant to that policy, the university would survey and analyze relocation needs, employ minimum notice requirements, pay moving expenses and relocation payments, and provide "other aspects of relocation assistance" including, in some cases, "last-resort housing."

**2.**

Good Neighbor asserts the mitigation measure for POP-1 impacts (substantial unplanned population growth) is unenforceable.  "Mitigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding instruments."  (Guidelines, § 15126.4, subd. (a)(2); CEQA, §

---

[5] The EIR noted that other consequences of project-driven growth such as impacts on transportation infrastructure, utilities, public services, recreational facilities, noise levels, air and water pollution, and greenhouse gas emissions were evaluated elsewhere in the document.

21081.6, subd. (b); *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1261.)  While the Regents can ensure the university provides the City of Berkeley and ABAG with summaries of annual enrollment and construction information, they have no authority to compel either entity to undertake planning for university-driven population growth.  (*See Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 859 [CEQA does not expand the authority of public agencies; agencies must rely on their existing powers to mitigate environmental impacts].)  Good Neighbor argues such planning is unlikely to occur because "Berkeley's General Plan is twenty years old" and the university's population is " 'not formally coordinated' " with ABAG.

The argument misses its mark.  ABAG is required by statute to allocate responsibility for the Bay Area's regional housing needs among its constituent cities and counties, including Berkeley.  (Gov. Code, § 65584.04.)  In devising its methodology for that allocation, it must consider multiple factors based on data from its constituent local governments.  Those factors specifically include "[t]he housing needs generated by the presence of . . a campus of . . the University of California within any member jurisdiction."  (Gov. Code, § 65584.04, subd. (e)(9).)  Berkeley, in turn, is required to include its allocated share of regional housing in its general plan's housing element, which it must review and revise every eight years.  (Gov. Code, §§ 65583, subd. (a)(1), 65588, subd. (e)(3)(A).  In view of these statutory obligations, there is no reason to believe either entity will fail in the future to plan for the population growth projected in the long range development plan.  (See CEQA, § 21081, subd. (a)(2); *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 365 [payment of share of improvement costs was valid mitigation measure where statutory directives indicated recipient agency would construct the needed infrastructure].)

40

We reject Good Neighbor's argument that the city will not actually do the planning. Good Neighbor cites a single sentence in the EIR stating that the population projections in the city's general plan EIR do not go beyond 2020, which in turn cites a "Draft General Plan EIR" dated 2001 that is not in our record. This is thin stuff. It does not tell us when the next housing element update is due or the status of any update in progress. We will not infer from it that the city will violate its statutory planning deadlines.

**3.**

We now turn to displacement. Impact POP-2, as noted above, concerned the "direct" displacement of existing tenants when university-owned buildings were demolished to make way for new development. "Though the proposed LRDP Update, at full development, would result in a substantial net increase in housing at UC Berkeley (11,731 beds), it is possible that housing development will be less than the total projected, or that individual future housing projects may involve the displacement of existing people or housing." Therefore, "this impact is considered *significant*." However, the impact would be reduced to less than significant when mitigated by adherence to the Relocation Assistance Policy's procedures for helping displaced residents obtain new housing.

Good Neighbor contends this analysis is legally inadequate for two related reasons. First, it fails to address potential environmental impacts caused by "indirect" displacement, i.e., displacement of existing residents caused by adding 8,173 people for whom the university will *not* provide housing. Second, it fails to assess the environmental impacts of direct and indirect displacement, including health and safety effects of crowding and homelessness and the need for construction of replacement housing.

41

Good Neighbor's first theory illustrates CEQA's long reach. CEQA does not treat a project's social and economic effects (such as displacement) as significant environmental impacts. (Guidelines, §§ 15064, subd. (e), 15131, subd. (a).) However, if a project may cause social or economic impacts that, in turn, cause physical effects on the environment, the EIR may be required to trace this chain of causation and analyze the resulting indirect environmental impacts. (Guidelines, §§ 15064, subd. (e), 15131, subd. (a).) The issue has arisen, for example, in cases where a proposed regional shopping center threatens to put downtown stores out of business and leave them vacant (economic effects), eventually leading to boarded up stores and urban blight (environmental effects). (See *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 169-170.)

More recent cases have emphasized how difficult it can be to establish a factual foundation for this sort of theory, even under the fair argument standard. In *Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677 (*Joshua Tree*), the petitioner cited testimony of a prominent local business owner that a proposed Dollar General store would take business away from existing local businesses, leading to urban blight. (*Id.* at pp. 686-688, 690-692.)

The court of appeal concluded the evidence failed to show a potential environmental effect. While members of the public may provide opinion evidence where the issue does not require special expertise, it explained, the same is not true for technical or scientific information. (*Joshua Tree, supra,* 1 Cal.App.5th at pp. 690-691.) " '[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*Id.* at p. 691.) The business owner was not an economist or otherwise qualified to opine on whether the new store would

42

cause urban decay; moreover, she offered no particular factual basis for her conclusion that it would. (*Ibid.*) Her conclusion was thus speculative and, although it made a certain amount of sense, did not constitute substantial evidence of an environmental impact. (See *Joshua Tree,* at p. 690; see also, *Visalia, supra,* 20 Cal.App.5th at pp. 9-17, 14-15.)

Good Neighbor relies principally on comments by Berkeley's planning director that, in the context of a housing shortage, displacement of residents resulting from unplanned and unmitigated population growth would exacerbate the city's existing homeless crisis. Homelessness, in turn, whether resulting from students unable to afford housing[6] or residents displaced by students, "leads to physical impacts on parks, streets and other public spaces, public safety issues related to homeless encampments locating in unsafe locations, and an increase in public health problems." In addition, the record includes a San Francisco Department of Public Health report on impacts of inadequate housing, which observes generally that a lack of affordable housing and displacement may result in homelessness. Comments on the draft EIR from members of the public summarily asserted the university's growth contributed to homelessness in Berkeley.

In view of *Joshua Tree* and *Visalia,* this evidence is insufficient. The displacement theory is more complicated than the blight scenario: new residents compete for housing, which drives up prices to a point that existing residents cannot afford, which causes them to become homeless, which leads to environmental impacts relating to homelessness (e.g., impacts to parks). Each of those steps requires expertise, a factual

---

[6] According to the university's housing survey, approximately 10 percent of undergraduates and approximately 20 percent of doctoral students had experienced homelessness while attending the university.

43

foundation, and analysis that does not exist in our record. There is no evidence whatever on the *magnitude* of any potential environmental impacts. The theory may appeal to common sense, and it may ring true in a region with crazy housing costs and rampant homelessness. But as *Joshua Tree* and *Visalia* explain, when a theory requires expert opinion, courts cannot substitute common sense, lay opinion, fears, or suspicions. (*Joshua Tree*, *supra,* 1 Cal.App.5th at pp. 690-691; *Visalia*, *supra*, 20 Cal.App.5th at pp. 15-17; CEQA, § 21080, subd. (e); see also, *Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 894.)

Finally, Good Neighbor asserts the EIR failed to assess whether indirect displacement will necessitate the construction of replacement housing elsewhere, which the EIR identified as a standard of significance for housing and population impacts. Not so. The "replacement housing" standard of significance refers to new housing constructed for tenants whose university-owned housing will be demolished to make way for new development, not to indirect displacement. It is within the lead agency's discretion to formulate standards of significance. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 884; Kostka & Zischke, *supra*, § 13.8.)

To the extent Good Neighbor is suggesting the EIR failed to adequately address the growth-inducing impacts of indirect displacement (see Guidelines § 15126.2, subd. (e)), we also disagree. The EIR analyzes the growth-inducing impacts at a general level of detail, as CEQA requires. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 369; *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 227-228.)

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions to vacate its order and judgment denying Good Neighbor's petition for writ of mandate and enter a

44

modified judgment consistent with our conclusions that the EIR inadequately analyzed potential alternatives to Housing Project No. 2 and impacts from noise and displacement. (CEQA, § 21168.9, subd. (a).)

Good Neighbor is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____
BURNS, J.

We concur:

_____
JACKSON, P.J.

_____
SIMONS, J.

A165451

Alameda County Superior Court, No. RG21110142, Hon. Frank Roesch.

Law Offices of Thomas N. Lippe, APC, Thomas N. Lippe; Soluri Meserve, A Law Corporation, Patrick M. Soluri, Osha R. Meserve, and James C. Crowder, for Plaintiffs and Appellants.

The Sohagi Law Group, PLC, Nicole H. Gordon, Margaret M. Sohagi, Mark J.G. Desrosiers; Lubin Olson & Niewiadomski LLP, Charles R. Olson, Philip J. Sciranka; Office of The General Counsel – University of California, Charles F. Robinson, Alison L. Krumbein; UC Berkeley, Office of Legal Affairs, David M. Robinson, for Defendants and Respondents.

Buchalter, A Professional Corporation, Douglas C. Straus, Alicia Cristina Guerra, for Real Party in Interest Resources for Community Development.